## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE VIRGIN MOBILE USA IPO
LITIGATION

This Document Relates To:

　　　　　ALL ACTIONS.

Lead Case No. 07-CV-10589 (TPG)

(Securities Class Action)

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY PROCEEDINGS PENDING RULING ON TRANSFER AND CONSOLIDATION BY THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

---

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
(212) 455-2700

*Counsel for Defendants Virgin Mobile USA, Daniel H. Schulman, Jonathan Marchbank, John D. Feehan, Jr., Frances Brandon-Farrow, Douglas B. Lynn, Mark Poole, Robert Samuelson, L. Kevin Cox, Thomas O. Ryder, and Kenneth T. Stevens*

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

*Counsel for Defendants Lehman Brothers, Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Bear, Stearns & Co., Inc., Raymond James & Assoc., Inc., and Thomas Weisel Partners, LLC.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................1

ARGUMENT............................................................................................................................2

    I.     Staying These Proceedings Will Promote Judicial Economy..................................3

    II.    Staying These Proceedings Will Not Prejudice Plaintiffs .......................................5

CONCLUSION...........................................................................................................................8

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 48 F. Supp. 2d
36 (D.D.C. 1999) ................................................................................................5

*Aikins v. Microsoft Corp.*, No. 00-0242 (AJM), 2000 U.S Dist. LEXIS
4371, (E.D. La. Mar. 24, 2000)........................................................................ 3

*Am. Seafood, Inc. v. Magnolia Processing, Inc.*, Nos. 92-1030, 92-1086
(HJH), 1992 U.S. Dist. LEXIS 7374 (E.D. Pa. May 7, 1992) ....................... 3, 5

*Arthur-Magna, Inc. v. Del-Val Fin. Corp.*, No. 90-4378 (AMW), 1991
U.S. Dist. LEXIS 1431 (D.N.J. Feb. 1, 1991) ................................................. 7

*D's Pet Supplies, Inc. v. Microsoft Corp.*, Nos. 99-76056 (GER),
U.S. Dist. LEXIS 16482 (E.D. Mich. Feb. 7, 2000)........................................ 5

*Dumont v. Charles Schwab & Co.*, Nos. 99-2840, et al. (CS), 2000
U.S. Dist. LEXIS 619 (E.D. La. Jan, 20, 2000)............................................... 7

*Egon v. Del-Val Financial Corp.*, No. Civ. 90-4338 (AMW), 1991
U.S. Dist. LEXIS 1420 (D.N.J. Feb. 4, 1991) ................................................. 7

*Falgoust v. Microsoft Corp.*, No. 00-0779 (AJM), 2000 U.S. Dist. LEXIS
5417, (E.D. La. Apr. 19, 2000) ........................................................................ 3

*Good v. Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804 (N.D. Cal. 1998) ............................. 3, 5, 6

*Hertz Corp. v. Gator Corp.*, 250 F. Supp. 2d 421 (D.N.J. 2003) ........................................... 3, 4, 6

*In re Multidist. Private Civil Treble Damage Litig. Involving Plumbing
Fixtures*, 298 F. Supp. 484 (J.P.M.L. 1968) ..................................................... 5

*Landis v. N. Am. Co.*, 299 U.S. 248 (1936) .................................................................... 3

*Mathis v. Bristol-Meyers Squibb, Co.*, No. 03-0308 (GTP), 2003 U.S. Dist.
LEXIS 3797 (E.D. La. Mar. 12, 2003) .............................................................3, 5

*Nekritz v. Canary Capital Partners, LLC*, Civ. A. No. 03-5081 (DRD),
2004 U.S. Dist. LEXIS 12473 (D.N.J. Jan. 12, 2004) ...................................... 4

*Portnoy v. Zenith Labs., Inc.*, No. 86-3512 (AMW), 1997 U.S. Dist.
LEXIS 16134 (D.D.C. Apr. 21, 1987)............................................................... 4

*Rivers v. Walt Disney Co.*, 980 F. Supp. 1358 (C.D. Cal. 1997) ........................................... 3, 4, 5

*Rosenfeld v. Hartford Fire Ins. Co.*, Nos. 88 Civ. 2153, 88 Civ. 2252
(MJL), 1988 U.S. Dist. LEXIS 4068 (S.D.N.Y. May 12, 1988) ...................... 7

*Sevel v. AOL Time Warner, Inc.*, 232 F. Supp. 2d 615 (E.D. Va. 2002) ........................................ 6

*Tench v. Jackson Nat'l Life Ins. Co.*, No. 99 C 5182 (EEB), 1999 U.S.
    Dist. LEXIS 18023 (N.D. Ill. Nov. 10, 1999).................................................................... 7

*Weinke v. Microsoft Corp.*, 84 F. Supp. 2d 989 (E.D. Wis. 2000) ................................................. 4

**Statutes**

15 U.S.C. § 78u-4(a)(1) ........................................................................................................... 5

15 U.S.C. § 78u-4(a)(3)(B) .................................................................................................. 5, 6

28 U.S.C. § 1407.................................................................................................................. 1, 5

Fed. R. Civ. P. 26(c) ................................................................................................................ 3

Defendants Virgin Mobile USA, Inc., Daniel H. Schulman, Jonathan Marchbank, John D. Feehan, Jr., Frances Brandon-Farrow, Douglas B. Lynn, Mark Poole, Robert Samuelson, L. Kevin Cox, Thomas O. Ryder, Kenneth T. Stevens, Lehman Brothers, Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Bear, Stearns & Co., Inc., Raymond James & Associates, Inc. and Thomas Weisel Partners, LLC (the "Defendants"), respectfully request that this Court stay this litigation until after the Judicial Panel On Multidistrict Litigation issues a decision on the motion filed in connection with this case to transfer all related securities actions to the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1407.

## INTRODUCTION

To date, four securities class actions have been filed alleging that the Prospectus and Registration Statement associated with the Virgin Mobile October 2007 IPO contained materially false and misleading statements in violation of the Securities Act of 1933. Three of the actions were filed in the Southern District of New York (the "New York Cases") [1] and one was filed in the District of New Jersey (the "New Jersey Case").[2] The parties to the New York Cases have signed stipulations consolidating these actions for pre-trial purposes. The stipulation in the Brodsky and Joseph actions was so ordered by this Court on December 20, 2007.[3] The parties to the New Jersey Case have entered into a similar stipulation, which was approved by the Honorable Susan D. Wigenton on December 17, 2007. However, the plaintiff in the New

---

[1]     *Brodsky v. Virgin Mobile USA, Inc., et al.*, 07-cv-10589 (S.D.N.Y. Nov. 26, 2007) ("Brodsky Compl."); *Joseph v. Virgin Mobile USA, Inc., et al.*, 07-cv-11060 (S.D.N.Y. Dec. 6, 2007) ("Joseph Compl."); *2 West, Inc. v. Virgin Mobile USA, Inc., et al.*, 07-cv-11625 (S.D.N.Y. Dec. 28, 2007) ("2 West Compl.").

[2]     *See* Exhib. 1, Complaint, *Volpe v. Schulman, et al.*, 07-cv-05619 (D.N.J. Nov. 11, 2007).

[3]     The stipulation in the 2 West Action was submitted for approval by this Court on January 7, 2008.

Jersey Case has stated that he will not agree to transfer the New Jersey Case to the Southern District of New York to be consolidated with the New York Cases.

On January 7, 2008, the Defendants filed a motion with the Judicial Panel on Multidistrict Litigation (the "Panel") to transfer the New Jersey Case to the Southern District of New York for coordinated or consolidated pre-trial proceedings (the "Transfer Motion").[4] Although the Defendants believe that plaintiffs' allegations are without merit, if these actions are to proceed, transfer of these actions to one district for coordinated pretrial proceedings is appropriate. To our knowledge, all of the parties to these actions agree that transfer and coordination of these actions in a single district is appropriate. The sole disagreement centers on the selection of the transferee district.

This Court should stay further pretrial proceedings in the New York Cases pending resolution of the Transfer Motion for three reasons. First, a stay would promote judicial economy by avoiding duplicative and wasteful judicial efforts. In the likely event that the MDL panel grants the Transfer Motion, any work done by this Court on setting a discovery schedule, resolving discovery disputes, and engaging in other pretrial matters either will need to be redone by this Court to account for the new case or, if the cases are transferred to a different district, will need to be redone by the new transferee court. Second, a stay would prevent the risk of inconsistent or conflicting rulings such as on the appointment of a lead plaintiff. Finally, plaintiffs will not suffer any prejudice from such a short stay of these actions.

## ARGUMENT

Pursuant to the Federal Rules of Civil Procedure, a court may "make any order which justice requires to protect a party . . . from annoyance, embarrassment, oppression, or

---

[4]     *See* Exhib. 2, Memorandum of Law of the Defendants in Support of Their Motion for Transfer of Related Securities Actions to the Southern District of New York Pursuant to 28 U.S.C. 1407 for Coordinated or Consolidated Proceedings.

undue burden or expense" for "good cause." Fed. R. Civ. P. 26(c). A court's power to stay proceedings is "incidental to the power inherent in every court to control the disposition of the causes [sic] on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Granting a stay of an action pending a motion to consolidate is "committed to the Court's discretion." *Hertz Corp. v. Gator Corp.*, 250 F. Supp. 2d 421, 426 (D.N.J. 2003) (staying action pending decision by the MDL Panel); *see also Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997).

Courts consider three factors when deciding whether proceedings should be stayed: (1) whether a stay will promote judicial economy by avoiding duplicative efforts; (2) whether the moving party will experience hardship and inequity if the action is not stayed; and (3) whether the non-moving party will suffer any prejudice if the proceedings are stayed. *Rivers*, 980 F. Supp. at 1360; *Mathis v. Bristol-Meyers Squibb, Co.*, No. 03-0308 (GTP), 2003 U.S. Dist. LEXIS 3797, at \*2 (E.D. La. Mar. 12, 2003). Here, each factor weighs in favor of staying this action pending resolution of the Transfer Motion.

**I.    Staying These Proceedings Will Promote Judicial Economy**

A stay should be granted in this action to avoid wasting judicial resources. "[A] majority of courts have concluded that it is often appropriate to stay preliminary pretrial proceedings while a motion to transfer and consolidate is pending with the MDL Panel because of the judicial resources that are conserved." *Rivers*, 980 F. Supp. at 1362; *see also Falgoust v. Microsoft Corp.*, No. 00-0779 (AJM), 2000 U.S. Dist. LEXIS 5417, at \*8 (E.D. La. Apr. 19, 2000) ("[T]he interests of judicial economy would best be served by granting a stay" pending the MDL Panel's determination on consolidation.); *Aikins v. Microsoft Corp.*, No. 00-0242 (AJM), 2000 U.S Dist. LEXIS 4371, at \*5 (E.D. La. Mar. 24, 2000) (same); *Good v. Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804, 809 (N.D. Cal. 1998); *Am. Seafood, Inc. v. Magnolia Processing, Inc.*, Nos. 92-1030, 92-1086 (HJH), 1992 U.S. Dist. LEXIS 7374, at \*5-6 (E.D. Pa. May 7, 1992);

3

*Weinke v. Microsoft Corp.,* 84 F. Supp. 2d 989, 990 (E.D. Wis. 2000); *Portnoy v. Zenith Labs., Inc.,* No. 86-3512 (AMW), 1997 U.S. Dist. LEXIS 16134, at \*2 (D.D.C. Apr. 21, 1987); *Hertz,* 250 F. Supp. 2d at 428 ("Given the short time until the MDL Panel will consider the motion, this Court's immediate and substantial investment of time is a waste of judicial resources"); *Nekritz v. Canary Capital Partners, LLC*, Civ. A. No. 03-5081 (DRD), 2004 U.S. Dist. LEXIS 12473, at \*14 (D.N.J. Jan. 12, 2004) (finding that interests of judicial economy were best served by a stay pending MDL Panel decision on transfer motion, with little or no disadvantage to plaintiff). As the *Rivers* court explained:

> First, . . . this Court will have needlessly expended its energies familiarizing itself with the intricacies of a case that would be heard by another judge. And second, any efforts on behalf of this Court concerning case management will most likely have to be replicated by the judge that is assigned to handle the consolidated litigation . . . .
>
> In addition, even if this Court denied [the] motion to stay, [and] ruled upon more substantive motions, . . . there are no guarantees that an order by this Court would not later be vacated and this Court's investment of time and resources would not have been in vain.

*Rivers*, 980 F. Supp. at 1360-61.

Such is the case here. Given that all four of these cases involve the same facts (alleged statements or omissions in the Virgin Mobile Prospectus and Registration Statement), allege violations of the Securities Act of 1933, and name the same core defendants (the issuer of the IPO, the issuer's officers and directors, and the lead underwriters of the IPO), it is very likely that the MDL panel will grant the Transfer Motion. In that event, any work done by this Court on setting a discovery schedule, resolving discovery disputes, and engaging in other pretrial matters will either need to be redone by this Court to account for the new case or, if the cases are transferred to a different district, will need to be redone by the new transferee court. To conserve judicial resources and avoid duplicative pretrial proceedings, this Court should stay proceedings in the New York Cases until the MDL Panel decides where these cases properly belong. *See*

4

*Mathis*, 2003 U.S. Dist. LEXIS at \*3 ("A temporary stay is appropriate in this case because it is inevitable that this case will be transferred to [the] MDL [proceedings].").

A stay is also warranted in this action because it will help to prevent potentially conflicting decisions by different courts—one of the main purposes of 28 U.S.C. § 1407. *See In re Multidist. Private Civil Treble Damage Litig. Involving Plumbing Fixtures*, 298 F. Supp. 484, 490-93 (J.P.M.L. 1968) (explaining that the remedial aim of the statute is "to eliminate the potential for conflicting contemporaneous pretrial rulings" by courts in cases appropriate for consolidation). Courts regularly stay pretrial proceedings to avoid potentially inconsistent rulings on pretrial matters. For example, in *Rivers*, the court found that in addition to the risk of wasted judicial resources, the potential for conflicting decisions weighed in favor of a stay. 980 F. Supp. at 1360-61; *see also Good*, 5 F. Supp. 2d at 809 (staying proceedings pending consolidation decision because "[t]he purpose of such transfers is . . . to eliminate the potential for conflicting pretrial rulings"); *Am. Seafood, Inc.*, 1992 U.S. Dist. LEXIS 7374 at \*6 ("[J]udicial economy and prejudice to the defendants weigh heavily in favor of [a] stay" when conflicting rulings are possible.); *D's Pet Supplies, Inc. v. Microsoft Corp.*, Nos. 99-76056, et al. (GER), 2000 U.S. Dist. LEXIS 16482, at \*3 (E.D. Mich. Feb. 7, 2000); *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 48 F. Supp. 2d 36, 43 (D.D.C. 1999).

The need to avoid conflicting judicial decisions is particularly apparent here. This case is a putative securities class action and is subject to the requirements of the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u-4(a)(1) ("The provisions of this subsection shall apply in each private action arising under this chapter that is brought as a plaintiff class action. . . ."). As a result, prior to proceeding a lead plaintiff must be selected. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i-ii). All of the cases that the Defendants seek to consolidate, including the ones before this Court, are based on essentially identical allegations. Further, the applicable principles for determining the appropriate lead plaintiff are prescribed by the PSLRA

and will be the same in each of the cases. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii). As such, the

transferee Court should consider any lead plaintiff motions made by interested shareholders in

any of these cases to ensure consistent application of the PSLRA and efficient resolution of these

securities actions. *See* 15 U.S.C. § 78u-4(a)(3)(B)(ii) ("If more than one action on behalf of a

class asserting substantially the same claim or claims arising under this title has been filed, and

any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall

not make the determination required by clause (i) until after the decision on the motion to

consolidate is rendered."); *see also Sevel v. AOL Time Warner, Inc.*, 232 F. Supp. 2d 615, 617

(E.D. Va. 2002) (granting motion to stay pending MDL decision). As the *Sevel* court explained:

> From the [PSLRA] statute, the Court finds it evident that it must
> not determine a lead plaintiff or approve the choice of lead counsel
> until after the decision on the motion to consolidate before the
> MDL has been rendered.

*Id.*

A stay therefore, would conserve judicial resources by allowing one judge to rule

on similar arguments, and would eliminate the possibility of conflicting decisions by different

courts. Thus, economy, efficiency, and uniformity of decision strongly favor staying proceedings

in this matter pending the MDL Panel's decision on the Transfer Motion.

**II.     Staying These Proceedings Will Not Prejudice Plaintiffs**

The plaintiffs will suffer no prejudice by what is likely to be a short stay.   The

next available hearing before the MDL Panel is in March 2008 and the Panel typically issues

decisions on a rolling basis starting two to three weeks after the hearing. *See, e.g., Hertz*, 250 F.

Supp. 2d at 428 ("Barring unusual circumstances, the MDL Panel will decide the motion in a

relatively short period of time"). Thus, the Transfer Motion likely will be decided just a few

months from now. This short duration of time weighs in favor of granting the stay. *See Good*, 5

F. Supp. 2d at 809 (granting stay where "stay pending a final decision by the MDL Panel would

likely be brief"); *Tench v. Jackson Nat'l Life Ins. Co.*, No. 99 C 5182 (EEB), 1999 U.S. Dist.

LEXIS 18023, at *2 (N.D. Ill. Nov. 10, 1999) (granting a stay as plaintiff would suffer no prejudice from the short delay).

Moreover, courts have generally concluded that the long-run benefits of a stay outweigh any minimal short-run costs to the plaintiff. *See Hertz*, 250 F. Supp. 2d at 428 (granting a stay despite potential harm to plaintiff because "[w]ithout a short stay, the Court loses the potential efficiencies that would be created by having pretrial issues involving common facts and law decided by a single judge"); *Egon v. Del-Val Financial Corp.*, No. Civ. 90-4338 (AMW), 1991 U.S. Dist. LEXIS 1420, at *2-3 (D.N.J. Feb. 4, 1991) ("[E]ven if a temporary stay can be characterized as a delay prejudicial to plaintiffs, there are considerations of judicial economy and hardship to defendants that are compelling enough to warrant such a delay."); *Rosenfeld v. Hartford Fire Ins. Co.*, Nos. 88 Civ. 2153 (MJL), 88 Civ. 2252, 1988 U.S. Dist. LEXIS 4068, at *4 (S.D.N.Y. May 12, 1988) ("While [plaintiffs] may suffer some initial delay, once the cases are coordinated and the defendants are able to respond to all the complaints in a coordinated manner, more time may well be saved than was lost."); *Dumont v. Charles Schwab & Co.*, Nos. 99-2840, et al. (CS), 2000 U.S. Dist. LEXIS 619, at *9 (E.D. La. Jan, 20, 2000); *Arthur-Magna, Inc. v. Del-Val Fin. Corp.*, No. 90-4378 (AMW), 1991 U.S. Dist. LEXIS 1431, at *4-6 (D.N.J. Feb. 1, 1991).

## CONCLUSION

For the forgoing reasons, Moving Defendants respectfully request that the Court stay all proceedings in the New York Cases, other than accepting for filing any motions for the appointment of lead plaintiff, pending the resolution of the Transfer Motion.

Dated:  January 22, 2008                    Respectfully submitted,

/s/ James Gamble
James Gamble
jgamble@stblaw.com

**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, New York  10017-3954
(212) 455-2700
(212) 455-2502 (fax)
*Counsel for Defendants Virgin Mobile USA,*
*Daniel H. Schulman, Jonathan Marchbank,*
*John D. Feehan, Jr., Frances Brandon-*
*Farrow, Douglas B. Lynn, Mark Poole, Robert*
*Samuelson, L. Kevin Cox, Thomas O. Ryder,*
*and Kenneth T. Stevens*

Dated:  January 22, 2008                    /s/ Susan L. Saltzstein
Susan L. Saltzstein
Susan.Saltzstein@skadden.com

**SKADDEN, ARPS, SLATE, MEAGHER &**
**FLOM LLP**
Four Times Square
New York, New York 10036-6522
(212) 735-3000
*Counsel for Defendants Lehman Brothers,*
*Merrill Lynch & Co., Merrill Lynch, Pierce,*
*Fenner & Smith Incorporated, Bear, Stearns &*
*Co., Inc., Raymond James & Assoc., Inc., and*
*Thomas Weisel Partners, LLC*

# Exhibit 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

James E. Cecchi
Melissa E. Flax
**CARELLA, BYRNE, BAIN, GILFILLAN,**
**CECCHI, STEWART & OLSTEIN**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 334-1700
Facsimile: (973) 994-1744

Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street – 12 Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**Attorneys for Plaintiff & the Class**

| | |
|---|---|
| Michael Volpe, Individually And On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> DANIEL H. SCHULMAN, DOUGLAS B. LYNN, JONATHAN MARCHBANK, MARK POOLE, JOHN D. FEEHAN, FRANCES BRANDON-FARROW, ROBERT SAMUELSON, L. KEVIN COX, THOMAS O. RYDER, KENNETH T. STEVENS, SPRINT NEXTEL CORP., CORVINA HOLDINGS LIMITED, LEHMAN BROTHERS, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., BEAR, STEARNS & CO., INC., RAYMOND JAMES & ASSOC., INC., THOMAS WEISEL PARTNERS, LLC and VIRGIN MOBILE USA, INC., <br><br> Defendants. | CIVIL ACTION NO. _____ <br><br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br><br><br> **JURY TRIAL DEMANDED** |

1

## NATURE OF THE ACTION

1.    This is a federal securities class action lawsuit brought on behalf of the purchasers of

Virgin Mobile USA, Inc. ("VM USA" or the "Company") common stock pursuant to its October 11,

2007 Initial Public Offering ("IPO" or the "Offering") of 27.5 million shares of common stock. In

connection with this Offering defendants raised gross proceeds of at least $412.5 million.

2.    VM USA, its entire Board of Directors, its Chief Financial Officer and the

Underwriters involved in the Offering (including, Lehman Brothers, Inc. ("Lehman Bros."), Merrill

Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), Bear, Stearns & Co., Inc. ("Bear Stearns"),

Raymond James & Assoc., Inc. ("Raymond James") and Thomas Weisel Partners, LLC ("Thomas

Weisel")), in addition to certain other controlling shareholders, are each charged with creating or

distributing a materially false and misleading Registration Statement and Prospectus in connection

with the Company's October 2007 IPO, in direct violation of the Securities Act of 1933.

Specifically, defendants each failed to conduct an adequate due diligence investigation into the

Company prior to the IPO, and they also each failed to reveal, at that time of the IPO, that Virgin

Mobile was also not performing according to plan and that results for the third quarter of 2007 - - *the*

*period ended a full 2 weeks prior to the VM USA IPO* - - showed growing losses as expenses rose

and business slowed, indicating that the Company would be forced to revise downward, its near-term

forward financial and operational guidance.

3.    It was only on November 16, 2007, approximately one month after the IPO, however,

that investors learned the truth about VM USA's financial and operational condition, after

defendants revealed that the Company had suffered a widening loss for the third quarter, the period ended September 30, 2007, as a result of rising expenses. For 3Q:07, the Company reported a *loss* of $7.3 million, or ($0.15) per share, compared with a loss of only $5.1 million, or ($0.10) per share, in the same period the prior year. These results also contrasted the $28.9 million in net income, and *profits* of $0.55 per share reported in the first six months of 2007 reported *prior* to the IPO. At that time, Defendants also revealed that fourth-quarter 2007 outlook called for between 350,000 and 400,000 net customer additions, an anemic amount analysts described as "weak," and that 4Q:07 guidance would be, what was described as, "well below" expectations.

4.    Following these belated disclosures of lower then expected 3Q:07 results, higher expenses and slowing sales, on November 16, 2007, shares of Company stock declined precipitously. That day, shares of VM USA fell almost 30% in intra-day trading - - declining from an opening trading price of $11.09 per share, to a trading low of $8.07 per share before closing the trading day at $9.10 per share. That trading day VM USA also experienced exceptionally heavy trading volume, with over 6.512 million shares traded - - more than five times the Company's recent average daily trading volume.

5.    The precipitous decline in the price of VM USA shares following defendants' belated disclosures was evidence of the eradication of the prior artificial inflation in the price of Company shares caused as a result of defendants' publication of a materially false and misleading Registration Statement and IPO Prospectus. As a result of their purchases of VM USA stock in connection with the October 2007 IPO, including those who purchased shares traceable to the Offering in the public markets immediately thereafter, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

3

## JURISDICTION AND VENUE

6.    The claims asserted herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act"). Jurisdiction is conferred by §22 of the Securities Act.

7.    Venue is proper in the United States District Court, Newark Vicinage, pursuant to §22 of the Securities Act, as defendant VM USA maintains its chief executive offices and principle place of business in this District, and/or the Individual Defendants and Underwriter Defendants - - Lehman Bros., Merrill Lynch, Bear Stearns, Raymond James and Thomas Weisel - - all conduct business in, and the wrongful conduct took place in, this District and in the Newark Vicinage. In addition, three of the Underwriter Defendants maintain offices in the Newark Vicinage.

## THE PARTIES

### Plaintiff

8.    Plaintiff Michael Volpe purchased shares of VM USA common stock pursuant and/or traceable to the Company's materially false and misleading Registration Statement and Prospectus issued by defendants in connection with the October 2007 IPO, including those shares detailed in the attached Certification, incorporated herein by reference, and was damaged thereby.

### Corporate Defendants

9.    Defendant **VIRGIN MOBILE USA, INC.** is a Delaware corporation headquartered in Warren, New Jersey, and formed in April 2007 in anticipation of the October 2007 IPO. According to Internet website *Yahoo.com/Finance's* Company profile, VM USA provides wireless communications services, offering prepaid services to the youth market in the United States. The Company also develops content and has relationships with third parties to procure and offer customized content, music, and other services, including short message services. The Company sells

4

its products through direct and third-party distribution channels and, as of March 31, 2007, reported approximately 4.88 million customers.

10.    Defendant **SPRINT NEXTEL, CORP.** (including affiliated entities, hereinafter "Sprint"), a Kansas corporation is, and at the time of the IPO was, one of the largest shareholders of the Company. Following the IPO, Sprint owned or controlled at least 18.5% of VM USA's shares issued and outstanding and, prior to the IPO, Sprint owned 46.63% of the Company's shares, or over 23.012 million shares. In connection with the October 2007 IPO, Sprint sold over 14.8% of its interest back to the Company, in addition to selling over 1.33 million shares to public investors in the Offering.    Accordingly, in connection with the October 2007 IPO, gross proceeds to Sprint for payment of equity was approximately $155 million, in addition to the repayment of debt owed to Sprint Ventures of $45 million. In connection with the IPO, defendant Sprint sold almost $20 million of its privately held Company stock.

11.    Defendant **CORVINA HOLDINGS LIMITED** ("Corvina") is, and at the time of the IPO was, the largest shareholder of the Company, owning and controlling at least 35.14% of the Company's combined voting power following the October 2007 IPO. Prior to the IPO, Corvina controlled over 46.6% of VM USA's voting power. Corvina is a holdings company organized under the laws of the British Virgin Islands. Approximately 87% of Corvina is held by Virgin Group Holdings Limited ("VGHL"), and the remaining 13% of Corvina is owned jointly by Gamay Holdings Limited ("Gamay") and certain senior executives of the Virgin Group - - including Richard Branson, founder of Virgin Group.[1]  The address of each of the above referenced persons and entities

---

1 Gamay is a wholly-owned subsidiary of VGHL. VGHL is jointly owned by (i) Sir Richard Branson, (ii) Cougar Investments Limited ("Cougar"), (iii) Plough Investments Limited ("Plough"), (iv) Deutsche Bank Trustee Services (Guernsey) Limited, solely in its capacity as trustee on behalf of

is c/o La Motte Chambers, La Motte Street, St. Helier, Jersey, JE1 1BJ , Channel Islands, Attention:

Abacus Secretaries (Jersey) Limited.

**Individual Defendants**

12.    The individuals identified below are referred to collectively herein as the "Individual

Defendants." The Individual Defendants are each liable for the false statements contained in the

materially false and misleading Registration Statement and Prospectus, as alleged herein, as those

statements were "group-published" information. The Individual Defendants include the following:

| NAME | POSITION |
|------|----------|
| **DANIEL H. SCHULMAN** ("Schulman") | Chief Executive Officer and Director |
| **JONATHAN MARCHBANK** ("Marchbank") | Chief Operating Officer |
| **JOHN D. FEEHAN JR.** ("Feehan") | Chief Financial Officer |
| **FRANCES BRANDON-FARROW** ("Brandon-Farrow") | Director |
| **DOUGLAS B. LYNN** ("Lynn") | Director |
| **MARK POOLE** ("Poole") | Director |
| **ROBERT SAMUELSON** ("Samuelson") | Director |

---

the Virgo Trust, The Libra Trust, the Jupiter Trust, the Mars Trust, the Venus Trust, the Leo Trust
and The Gemini Trust (such trusts collectively referred to as the "DB Trusts"), and (v) RBC Trustees
(C.I.) Limited, solely in its capacity as trustee on behalf of The Aquarius Trust, The Aries Trust, the
Capricorn Trust, The Pisces Trust and The Saturn Trust (such trusts collectively referred to as the
"RBC Trusts"). The principal beneficiaries of the DB Trusts and the RBC Trusts are Sir Richard
Branson and/or certain members of his family.

**L. KEVIN COX**
("Cox")                                    Director – Member Audit Committee

**THOMAS O. RYDER**
("Ryder")                                  Director – Chairman Audit Committee

**KENNETH T. STEVENS**
("Stevens")                                Director – Member Audit Committee

13.    The IPO Registration Statement identified as the sole members of the Audit

Committee, defendants Cox, Stevens and Ryder (Chair) - - three Board members who had *not* yet

even joined the Board, as of September 12, 2007.   Regardless of the late addition of these three

defendants to the Board and to the Audit Committee - - at least by the time of the IPO - - the

Prospectus outlined the duties and responsibilities of these defendants, as members of the Audit

Committee, in part, as follows:

> **Audit Committee.** *We anticipate that our audit committee will consist of Messrs.*
> *Cox, Ryder and Stevens and that Mr. Ryder will serve as its chair.* All the members
> of our audit committee will qualify as "independent" in accordance with the rules
> promulgated by the NYSE. Each member of our audit committee will also satisfy the
> criteria for "independence" under special standards established by the SEC for
> members of audit committees. In addition, *Mr. Ryder meets the qualifications of an*
> *"audit committee financial expert"* in accordance with the SEC rules, as determined
> by our board of directors.
>
> *The audit committee will be responsible, among other things,* for (1) recommending
> the hiring or termination of independent auditors and approving any non-audit work
> performed by such auditor; (2) recommending the overall scope of the audit;
> (3) *assisting the board in monitoring the integrity of our financial statements*, the
> independent auditors' qualifications and independence, the performance of the
> independent auditors and our internal audit function and our compliance with legal
> and regulatory requirements; (4) annually reviewing an independent auditors' report
> describing the auditing firms' internal quality-control procedures, any material issues
> raised by the most recent internal quality-control review, or peer review, of the
> auditing firm; (5) *discussing the annual audited financial and quarterly statements*
> *with management and the independent auditor; (6) discussing earnings press*
> *releases, as well as financial information and earnings guidance provided to*
> *analysts and rating agencies; (7) discussing policies with respect to risk assessment*
> *and risk management;* (8) meeting separately and periodically with management,

7

internal auditors and the independent auditor; (9) *reviewing with the independent auditor any audit problems or difficulties and managements' response*; (10) setting clear hiring policies for employees or former employees of the independent auditors; (11) annually reviewing the adequacy of the audit committee's written charter; (12) handling such other matters that are specifically delegated to the audit committee by the board of directors from time to time; (13) reporting regularly to the full board of directors; and (14) evaluating the board of directors' performance.

[Emphasis added.]

14.     Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

15.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and

8

omissions made in connection with the issuance of common stock in October 2007, violated these specific requirements and obligations.

16.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company at the time of the Offering. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

**IPO Underwriter Defendants**

17.    The investment banks listed below are named as defendants in this action and are referred to collectively herein as the "Underwriter Defendants." In connection with the October 2007 IPO, the Underwriter Defendants acted as "Lead Underwriters" of the Offering - - distributing 27.5 million shares of VM USA stock to investors, and initiating the first public market for VM USA shares. The distribution of the VM USA shares awarded the Underwriter Defendants in the IPO occurred, as follows:

| Underwriters | Number of Shares |
|---|---|
| LEHMAN BROTHERS INC. | 8,525,000 |
| MERRILL LYNCH, PIERCE, FENNER & SMITH INC. | 8,112,500 |
| BEAR, STEARNS & CO. INC. | 8,112,500 |
| RAYMOND JAMES & ASSOCIATES, INC. | 1,375,000 |
| THOMAS WEISEL PARTNERS LLC | 1,375,000 |

9

Total                          27,500,000

18.     In connection with the October 2007 IPO, the Underwriter Defendants were paid over

$23.718 million in gross fees - - paid indirectly by purchasers of the Company's shares. The

Underwriter Defendants were paid at least $0.8625 per share in connection with the sale of the 27.5

million shares.

19.     In addition to the millions of dollars in compensation they received as Underwriters,

defendants Merrill Lynch and Bear Stearns also had a large, direct financial interest in the VM USA

IPO to the extent that they received approximately 20% of net proceeds of the Offering itself as

repayment of prior debt. As evidence of the foregoing, the "Use of Proceeds" section of the IPO

Prospectus stated, in part, the following:

### USE OF PROCEEDS

The Operating Partnership will use the sale proceeds (1) to repay a $150 million
portion of the term loan outstanding under our senior secured credit facility, (2) to
repay approximately $45 million of indebtedness owed to Sprint Nextel under the
terms of our subordinated secured revolving credit facility and (3) for general
corporate and other purposes.

* * *

*Affiliates of Merrill Lynch and Bear Stearns are lenders under our senior secured
credit facility and will receive approximately 9.4% and 11.7%, respectively, of the
proceeds to us of this offering....*

[Emphasis added.]

20.     Shareholders were willing to, and did, pay over $23.7 million in combined fees to

compensate the Underwriter Defendants for conducting a purported significant "due diligence"

investigation into VM USA in connection with the IPO. In addition, investors were also willing to

allow over $80 million of IPO proceeds to be paid directly to Underwriters Bear Stearns and Merrill

Lynch, because investors believed these payments would assure that the Underwriters conducted a

10

reasonable due diligence investigation to determine that the IPO was conducted in accordance with SEC rules, and state and federal regulations. The Underwriter Defendants due diligence investigation was, therefore, a critical component of the VM USA IPO, and this was supposed to provide investors with important safeguards and protections.

21.     The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into VM USA sales, accounting, controls, procedures and it also required defendants to test the assumptions and verify the projections adopted or ratified by defendants, to the extent a reasonable investor with access to such confidential corporate information would. A reasonable due diligence investigation would have extended well beyond a mere casual view of VM USA books and records, and its accounting, financial report and operational and financial controls. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

22.     Moreover, based on the special circumstances surrounding the VM USA IPO, defendants' due diligence investigation was of critical importance because, as defendants were well aware, material deficiencies in the Company's operating controls and accounting procedures were detected at the end of the second quarter of 2007, the period ended June 30, 2007. Evidence that the circumstances surrounding the VM USA IPO demanded from all defendants the most heightened due diligence pre-offering investigation appeared in the Registration Statement, in part, as follows:

> *We identified material weaknesses in our internal controls and procedures over financial reporting*. A material weakness is defined by the standards issued by the Public Company Accounting Oversight Board as a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected. *Our controls failed to detect the inaccurate reporting resulting from system interface failures for recovery fees for certain airtime taxes and regulatory charges and accrued revenues which affected several financial accounts including net service revenue, cost of sales, deferred revenue and accrued taxes.*

During the preparation of our financial statements for the six months ended June 30, 2007, we identified errors in our financial statements in the amount of $0.5 million, $(0.3) million, $(0.3) million and $3.8 million to our net income/(loss) for the years ended December 31, 2006, 2005, 2004 and for the three months ended March 31, 2007, respectively. *These errors, which we have determined to be material weaknesses in our internal controls over financial reporting, were primarily the result of system interface failures for recovery fees for certain airtime taxes and regulatory charges and accrued revenues, which overstated our net service revenue and overstated our cost of service in each period, except for the three month period ended March 31, 2007, which understated our net service revenue and overstated our cost of service....*

[Emphasis added.]

23.    Like the Individual Defendants, it is also appropriate to treat the Underwriter Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Moreover, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about VM USA's business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

### MATERIALLY FALSE AND MISLEADING STATEMETNS IN THE IPO REGISTRATION STATEMENT AND JOINT PROXY/PROSPECTUS

24.    At the time of the IPO, the Registration Statement and Proxy-Prospectus filed with the SEC and made available to investors described VM USA as a company with a unique business

plan to sell no-contract wireless telecom services, and a company that was experiencing strong

demand and consistent growth in subscribers, revenues and earnings. As evidence of this, the IPO

Prospectus stated, in part, the following:

> We are a leading national provider of wireless communications services, offering prepaid, or pay-as-you-go, services targeted at the youth market. Our customers are attracted to our products and services because of our flexible monthly terms, easy to understand pricing structures, stylish handsets offered at affordable prices and relevant mobile data and entertainment content. We believe that the appeal of our brand and products and services extends beyond our target audience and estimate that approximately half of our current customers are ages 35 and over. We offer our products and services on a flat per-minute basis and on a monthly basis for specified quantities, or buckets, of minutes purchased in advance—in each case without requiring our customers to enter into long-term contracts or commitments.
>
> We were founded as a joint venture between Sprint Nextel and the Virgin Group and launched our service nationally in July 2002, reaching one million customers in November 2003, within eighteen months of our national launch. *We have continued to grow our customer base rapidly and, as of December 31, 2006, we served approximately 4.57 million customers,* which we estimate represented approximately a 15% share of the pay-as-you-go market and a *19.0% increase over the 3.84 million customers we served as of December 31, 2005.* As of June 30, 2007, we served approximately 4.83 million customers. *Our revenues and net loss for the year ended December 31, 2006 were approximately $1.1 billion and $(36.7) million, respectively. Our revenues and net income for the six months ended June 30, 2007 were approximately $666.9 million and $26.5 million, respectively.* As of June 30, 2007 and December 31, 2006, our members' accumulated deficit was approximately $(614.4) million and $(643.9) million, respectively.

[Emphasis added.]

25.    The IPO Registration Statement also reported the significant growth opportunities that

would continue to allow defendants to expand the Company's business in the foreseeable near-term,

including the factors that distinguished VM USA from its competitors, in part, as follows:

> We believe *that two key factors distinguish us from many of our competitors: our focus on the youth and pay-as-you-go segments of the U.S. wireless market and our mobile virtual network operator, or MVNO, business model.* Our focus on the youth and pay-as-you-go segments of the U.S. wireless market allows us to tailor our products and services, advertising, customer care, distribution network and overall operations to the needs and desires of our target market, which we believe is underserved by wireless providers. We control our customers' experience and all

13

customer "touch points," including brand image, pricing, mobile content, marketing, distribution and customer care. As an MVNO, however, *we do not own or operate a physical network, which frees us from related capital expenditures and allows us to focus our resources and compete effectively against the major national wireless providers in our target market.*

[Emphasis added.]

26.    The IPO Registration Statement also identified several "Competitive Strengths" that

were purportedly allowing VM USA to compete effectively in the U.S. wireless telecom market

including, in part, the following:

*Differentiated Market Approach.* We have been pioneers in the U.S. wireless industry, offering innovative, youth-oriented pay-as-you-go plans without long-term contracts or commitments....

*Strong Brand.* Virgin Mobile is the number one brand for prepaid wireless services in the United States in awareness and purchase consideration among 14-34 year-olds...

*Extensive and Efficient Distribution.* Our nationwide distribution network is comprised of 130,000 third party retail stores that offer account replenishment....

*Award-winning Customer Service.* ...In both 2006 and 2007, we were the sole recipient of the J.D. Power and Associates Award for wireless prepaid customer satisfaction.

*Capital Efficient Business.* Our mobile virtual network operator, or MVNO, business model, easy-to-understand products and services, cost-efficient distribution channels and focused marketing strategy have made us *one of the lowest cost operators in the wireless industry*..... In addition, we pay Sprint Nextel for wireless services only to the extent of our customers' usage. As a result, *we have a highly variable cost structure, which we believe has allowed us to reach profitability faster than if we were to maintain our own network.*

*Proven and Committed Management Team.* We are led by a highly experienced management team....

[Emphasis added.]

14

27.    The IPO Registration Statement also reported that the Company's "Business

Strategy," would purportedly allow VM USA to "continue [its] growth and improve [its]

profitability," in the foreseeable near-term, in part, as follows:

> *Focus on Fast-growing Segments of U.S. Wireless Market.* We focus on two fast-growing segments of the U.S. wireless market: youth and pay-as-you-go. We believe there is substantial demand in the United States for our straightforward and fun wireless communication services. According to the Yankee Group, in 2006, there were approximately 29.5 million pay-as-you-go wireless customers in the United States and such number is expected to grow to approximately 53.0 million by 2011, representing a 12.4% compound annual growth rate over the same period. *We plan to continue to penetrate the youth segment and grow our market share by continuing to tailor our products, services and advertising message to this market, leveraging our brand through new and existing distribution channels and utilizing select youth-oriented media channels that specifically resonate with our target market*, such as MTV, Vice, Facebook.com, MySpace.com and outdoor billboards and postings in key trendsetting neighborhoods.

> *Continue Product and Service Innovation.* We have a proven ability to innovate and adapt to our customers' needs.... *We intend to continue our efforts to address our market's evolving needs* and to offer innovative and popular products and services ahead of our competitors.

> *Enhance our Brand Strength.* We aim *to maintain and strengthen* a vibrant brand *image* that resonates with our customers and distinguishes us from other wireless service providers....

> *Leverage Our Scale and Infrastructure to Drive Profitable Growth.*    As of June 30, 2007, in five years since our national launch, we had grown our customer base to approximately 4.83 million. *We have built the infrastructure to support future growth in customers and usage while leveraging the advantages of our predominantly variable cost structure*. As we continue to scale the business, we expect our growing customer base to translate into *improved cost economies without the need for substantial capital investment.*

[Emphasis added.]

28.    The IPO Registration Statement also reported the Company's financial results for the

full years 2004, 2005 and 2006 and for the first six months of 2007. These results demonstrated the

Company's purported financial strength -- as well as the positive revenue and earnings growth trends

in VM USA's business -- in part, as follows:

16

29.    The positive statements concerning the Company's, business, operations, competitive strengths and growth strategy, as well as its reported results from operations painted an unrealistically positive picture of the Company's operations and its foreseeable prospects at the time of the October 2007 IPO. In fact, at the time of the IPO, VM USA had already reported a wider than expected loss for 3Q:07, defendants already knew that expenses were increasing above plan, and they

| (in thousands, except share data and Other data unless otherwise indicated) | Virgin Mobile USA, LLC | | | | | Pro Forma Consolidated Virgin Mobile USA, Inc. | |
|---|---|---|---|---|---|---|---|
| | Fiscal Year Ended December 31, | | | Six Months Ended June 30, (Unaudited) | | Year Ended December 31, | Six Months Ended June 30, (Unaudited) |
| | 2004 | 2005 | 2006 | 2006 | 2007 | 2006 | 2007 |
| **Income statement data:** | | | | | | | |
| Operating revenue: | | | | | | | |
| Net service revenue | $ 567,006 | $ 683,816 | $ 1,020,055 | $ 508,345 | $ 632,050 | $ 1,020,055 | $ 632,050 |
| Net equipment revenue | 123,632 | 105,115 | 90,524 | 33,141 | 34,852 | 90,524 | 34,852 |
| Total operating revenue | 690,638 | 788,931 | 1,110,579 | 541,486 | 666,902 | 1,110,579 | 666,902 |
| Operating expenses: | | | | | | | |
| Cost of service (exclusive of depreciation and amortization) | 229,283 | 309,321 | 293,130 | 143,084 | 183,068 | 293,130 | 183,379 |
| Cost of equipment | 364,092 | 361,655 | 378,981 | 193,679 | 193,024 | 378,981 | 193,024 |
| Selling, general and administrative (exclusive of depreciation and amortization) | 253,118 | 346,470 | 401,722 | 187,365 | 218,405 | 405,763 | 220,377 |
| Loss (gain) from litigation | — | 29,861 | (15,384) | — | (15,384) | — | — |
| Depreciation and amortization | 12,893 | 19,413 | 28,781 | 13,124 | 16,731 | 28,381 | 16,731 |
| Total operating expense | 859,394 | 1,066,840 | 1,092,840 | 501,252 | 613,139 | 1,096,871 | 614,106 |
| Operating (loss)/income | (168,956) | (80,908) | (12,739) | 40,234 | 53,763 | 13,708 | 52,796 |
| Interest expense | 5,427 | 22,008 | 25,178 | 25,672 | 27,447 | 35,503 | 17,480 |
| Other (income)/expense | (505) | 949 | 2,268 | 1,445 | (200) | 2,268 | (195) |
| Minority interest | — | — | — | — | — | (4,407) | 6,606 |
| (Loss)/income before taxes | (173,878) | (103,865) | (36,707) | 13,117 | 26,516 | (19,656) | 28,905 |
| Income tax expense | — | — | — | — | — | — | — |
| Net (loss)/income | $ (173,878) | $ (103,865) | $ (36,707) | $ 13,117 | $ 26,516 | $ (19,656) | $ 28,905 |
| Net (loss)/income per share: | | | | | | | |
| Basic | N/A | N/A | N/A | N/A | N/A | $ (0.37) | $ 0.55 |

knew that VM USA would be forced to adjust guidance downward for 4Q:07 and full year 2007. In addition to the foregoing, these statements were also materially false and misleading because they materially misstated or omitted to disclose, in part, the following:

(a)    At the time of the IPO, the Company had *already* completed its 3Q:07 and knew or recklessly or negligently disregarded that VM USA had reported wider then expected losses, and that defendants would be forced to lower guidance for 4Q:07 and full year 2007;

(b)    At the time of the IPO, the Company had failed to disclose that expenses were *already* rising above plan and that losses were widening, such that these material omissions rendered the Registration Statement and Prospectus, in light of the statements made by defendants and contained therein, materially false and misleading and in violation of GAAP, SEC reporting rules and the Company's own disclosure policies and procedures;

(c)    At the time of the IPO, VM USA's control deficiencies were much more sever than revealed, and the Company did not even maintain minimum standards of good Corporate Governance or controls and procedures, as is required by the SEC and the Company's own internal guidelines and standards of business conduct; and

(d)    At the time of the October 2007 Offering, defendants had *not* conducted an adequate due diligence investigation into VM USA, that would have revealed many of the adverse conditions complained of herein, and that would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

## MATERIALLY FALSE & MISLEADING STATEMENTS
## REGARDING GAAP & SEC ACCOUNTING RULE COMPLIANCE

30.    In addition to the foregoing, the Registration Statement and Prospectus also contained misrepresentations and omissions related to VM USA's reporting in conformity with Generally

17

Accepted Accounting Principles, SEC accounting rules and the Company's own stated reporting

procedures. As evidence of this, the VM USA IPO stated, in part, the following:

**Critical Accounting Policies and Estimates**

***Our consolidated financial statements are prepared in accordance with GAAP.***
Preparation of these consolidated financial statements requires us to make judgments,
estimates and assumptions which affect the reported amounts of assets and liabilities
and the disclosure of contingent assets and liabilities at the date of the consolidated
financial statements as well as the reported revenue and expenses during the
reporting periods. These estimates and judgments are subject to an inherent degree of
uncertainty. We believe that the estimates and judgments upon which we rely are
reasonable based upon information available to us at the time that these estimates and
judgments are made. ***We continually evaluate our judgments, estimates and
assumptions. To the extent there are material differences between these estimates
and actual results, our consolidated financial statements will be affected.***

**2. Summary of Significant Accounting Policies**

*Accounting Principles*

The financial statements and accompanying notes are prepared in accordance with
accounting principles generally accepted in the United States.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles
generally accepted in the United States requires management to make estimates and
assumptions that affect the reported amounts of assets and liabilities and the
disclosure of contingent liabilities at the date of the financial statements and reported
amounts of revenues and expenses during the reporting period...... Estimates and
assumptions are reviewed periodically and the effects of revisions are reflected in the
Financial Statements in the period they are deemed to be necessary. Actual results
could differ from those estimates.

\* \* \*

**VIRGIN MOBILE USA, LLC**
**Notes to Financial Statements (Unaudited)**

**Basis of Presentation**

***The accompanying unaudited Financial Statements of Virgin Mobile USA, LLC
(the "Company") have been prepared in accordance with accounting principles
generally accepted in the United States of America and with Article 10 of Regulation
S-X.*** Accordingly, they do not include all information and disclosures necessary for a

presentation of the Company's financial position, results of operations and cash flows in conformity with accounting principles generally accepted in the United States of America. In the opinion of management, the interim financial information provided herein reflects all adjustments (consisting of normal and recurring adjustments) necessary for a fair presentation of the Company's financial position and its results of operations and cash flows for the interim periods presented on a basis consistent with the Company's historical audited financial statements and the accompanying notes included elsewhere in this prospectus. ***The results of operations for the six months ended June 30, 2007 are not necessarily indicative of the results to be expected for the full year....***

[Emphasis added.]

31.    Regarding the Company's accounting and financial reporting, the IPO Registration

Statement also stated, in part, the following:

### SUMMARY FINANCIAL AND OTHER DATA

The following table sets forth the summary historical and other data for Virgin Mobile USA, LLC and pro forma financial data for Virgin Mobile USA, Inc. as of the dates and for the periods indicated. Virgin Mobile USA, Inc. is a recently formed holding company which has not engaged in any business or other activities except in connection with its formation and the reorganization transactions described elsewhere in this prospectus. Accordingly, all financial and other information herein relating to periods prior to the completion of the reorganization transactions is that of Virgin Mobile USA, LLC. The summary balance sheet data as of December 31, 2005 and 2006 and the statement of operations data for each of the years ended December 31, 2004, 2005 and 2006 have been derived from Virgin Mobile USA, LLC's audited financial statements included elsewhere in this prospectus. ***The summary balance sheet data as of June 30, 2007 and the statement of operations data for the six months ended June 30, 2006 and 2007 have been derived from Virgin Mobile USA, LLC's unaudited financial statements included elsewhere in this prospectus....***

***The summary unaudited pro forma financial information has been developed by application of pro forma adjustments to the historical consolidated financial statements appearing elsewhere in this prospectus..... The unaudited pro forma adjustments are based upon available information and certain assumptions that we believe are reasonable under the circumstances.*** The summary unaudited pro forma financial information is presented for informational purposes only and is not necessarily indicative of and does not purport to represent what our financial position or results of operations would actually have been had the transactions been consummated as of the dates indicated. In addition, ***the summary unaudited pro forma financial information is not necessarily indicative of our future financial condition or results of operations.***

19

[Emphasis added.]

32.    Unbeknownst to investors, however, the IPO Registration Statement and Prospectus were materially false and misleading and contained untrue statements of material fact and omitted to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Specifically, the Company's statements regarding VM USA's GAAP and SEC rule compliance failed to disclose that, at the time of the IPO, defendants violated and caused or allowed the Company to violate GAAP and SEC rules by failing to disclose that, prior to the IPO, the Company had posted a larger than expected loss in 3Q:07, expenses were rising above plan, and that the remainder of the year would not meet the Company's growth expectations.

33.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

34.    However, pursuant to GAAP and pursuant to SEC Rule 12b-20, the Company's periodic reports must contain information that is necessary to make the required statements, *__in light of the circumstances under which they are made, not misleading__*. In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, *a discussion of any material changes in the registrant's results of operations* with respect to the most recent fiscal year-to-date period for which an income statement is provided.

20

35.    *Instructions to Item 303 require that the this discussion identify any significant*

*elements of registrant's income or loss from continuing operations that are <u>not</u> necessarily*

*representative of the registrant's ongoing business.*    Item 303(a)(2)(ii) to Regulation S-K requires

the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> *Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.*

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> *The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.* This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. .

[Emphasis added.]

36.    The GAAP requirement for recognition of an adequate provision for foreseeable costs

and an associated allowance applies to interim financial statements as required by Accounting

Principles Board Opinion No. 28.  Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. *To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.*

[Emphasis added.]

37.    The Company's financial statements contained in the IPO Registration Statement and

Prospectus were presented in a manner that violated the principle of fair financial reporting and the

following GAAP, among others:

(a)    The principle that financial reporting should provide information that is useful

to present and potential investors and creditors and other users in making rational investment, credit

21

and similar decisions (FASB Statement of Concepts No. 1).

(b)    The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)    The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)    The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(j)    The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(k)    The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

38.    In addition, at the time of the October 2007 IPO, defendants also violated SEC disclosure rules and the Company's own stated disclosure policies and procedures, as follows:

(a)    defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net

revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made at the time of the October 2007 IPO, materially false and misleading; and

(b)    by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

39.    Defendants were required to disclose, in the IPO Registration Statement and Prospectus, the existence of the material facts described herein - - including the adverse results for 3Q:07, ended September 30, 2007 - - and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP.  The Company failed to make such disclosures and to account for, and to report, its financial statements in conformity with GAAP.  Defendants knew, or were reckless in not knowing, the facts which indicated that the IPO Registration Statement and Prospectus which were disseminated to the investing public in connection with the IPO, were materially false and misleading for the reasons set forth herein.

40.    Had the true financial position and negative results of operations for the Company's 3Q:07 been disclosed prior to the IPO, defendants would not have been able to sell 27.5 million shares VM USA common stock at $15.00 per share, if at all.

## MATERIALLY FALSE & MISLEADING RISK DISCLOSURES

41.    In addition to the materially false and misleading statements and omissions regarding the Company's accounting, the Registration Statement and Prospectus also contained almost 25 pages of purported "Risk Disclosures," that were *not* designed or intended to alert investors to the true risk of investing in VM USA common stock - - including the risk that the Company's operations

23

were *already* behind plan, and that defendants *already* knew that the Company could not achieve the

growth models that they forecast or adopted. In fact, rather than disclose the risks that defendants

*already* knew existed, the Registration Statement was designed to, and did, obfuscate the true risks

facing investors, by diverting investors' attention to, in part, the following:

### Selected Risk Factors and Potential Conflicts of Interest

*Competition in the wireless industry.* The wireless communications market is extremely competitive, and competition for customers is increasing....

*Competitive pressure to reduce prices for our products and services.* To remain competitive with existing and future competitors, we may be compelled to offer greater subsidies for our handsets, reduce the prices for our services or increase the available minutes that we offer under our prepaid monthly, or hybrid, service plans....

*New service offerings.* We cannot be certain that our new service offerings will be profitable or successful....

*Customer turnover.* Our rate of customer turnover, or "churn," may be affected by several factors...

*Significant amount of debt.* The level of our indebtedness and restrictive debt covenants in our credit agreements could materially adversely affect our business....

*Tax receivable agreements.* We will be required to compensate Sprint Nextel and the Virgin Group for certain tax benefits....

*Large number of shares eligible for future sale and for exchange.* The market price of our Class A common stock could decline as a result of sales of a large number of shares of Class A common stock in the market after this offering....

*Use of proceeds.* Affiliates of Merrill Lynch and Bear Stearns are lenders under our senior secured credit facility and will receive a significant portion of the proceeds that we will receive in this offering and use to repay those borrowings.

*Dilution.* The book value of shares of our Class A common stock purchased in this offering will be immediately diluted.

[Emphasis added.]

42.   The only purported selected risk disclosure that even discussed the Company's

financial performance said nothing of the actual sub-par performance of 3Q:07 and, instead, it alerted

investors only to contingencies that could possibly have an adverse impact VM USA, at some point

in the unknown future, as follows:

> ***Short operating history***. We have a limited operating and financial history and
> cannot be certain that our MVNO business model will be profitable or competitive.
> We have experienced, and ***may continue*** to experience, operating losses and
> significant fluctuations in our revenues and cash flows. ***If*** our revenues and earnings
> growth are not sustainable, we ***may not*** be able to generate the earnings necessary to
> fund our operations, continue to grow our business, satisfy our debt covenants or
> repay our debt obligations.

[Emphasis added.]

43.   The expanded Risk Disclosure section was also designed to obfuscate the true risk of

investing in the Company, and added little more insight into the actual risks concerning the

Company's operational and/or financial performance, other than the following:

> **Risks Related to Our Business**
>
> ***We have a short operating history which may not be indicative of our future
> performance and, if our revenue and earnings growth are not sustainable, we may
> not be able to generate the earnings necessary to fund our operations, continue to
> grow our business or repay our debt obligations.***
>
> We launched our service nationally in July 2002 and had no revenues before that
> time. Consequently, we have a limited operating and financial history upon which to
> evaluate our business model, financial performance and ability to succeed in the
> future. ***You should consider our prospects in light of the risks we may encounter,
> including risks and expenses faced by new companies competing in rapidly
> evolving and highly competitive markets***. We cannot be certain that our MVNO
> business model or any specific products or services ***will be*** profitable or competitive
> in the long-term against larger, facilities-based wireless providers or other MVNOs.
> We also cannot predict whether our MVNO model ***will allow*** us to offer the wireless
> services that customers may demand in the future. We have experienced, and ***may
> continue to experience***, significant fluctuations in our revenues and cash flows. If we
> are unable to achieve sufficient revenues and earnings from operations, our financial
> results ***will be*** adversely affected and we will not have sufficient cash to fund our
> current operations, sustain the continued growth of our business, satisfy our debt
> covenants or repay our debt obligations. Failure to satisfy our debt covenants (as has

occurred in the past) or make any required payments could result in defaults under our credit agreements. We have experienced, and *may* continue to experience, operating losses. In the event that we do become profitable, *we can provide no assurances that such profitability can or will be sustained in the future.*

\* \* \*

*Our business is seasonal, and we depend on fourth quarter customer additions; our results of operations for future periods will be affected negatively if we fail to deliver strong customer growth in the fourth quarter of any year.*

The wireless business in the United States generally, and in the prepaid business in particular, is seasonal and is often disproportionately dependent on fourth quarter results. *Our business has experienced a similar pattern and we expect this pattern to continue in the future.* If our fourth quarter customer additions fail to meet our expectations, it could adversely affect our results of operations and cash flows.

[Emphasis added.]

44.    In addition to the foregoing, other examples of non-relevant "risk disclosures" contained in the Registration Statement also included, in part, the following: (a) *Competition in the wireless industry could adversely affect our revenues and profitability*; (b) *We may face competitive pressure to reduce prices for our products and services, which may adversely affect our profitability and other financial results*; (c) *Failure to develop future service offerings may limit our ability to compete effectively and grow our business;* (d) *Higher than expected customer turnover could result in increased costs and decreased revenues, which would have an adverse effect on our profitability*; (e) *We may lose customers if we fail to keep up with rapid technological change occurring in the wireless industry*; (f) *Bulk handset purchase and trading schemes may curtail our ability to offer handsets at subsidized retail prices and thus limit our ability to acquire new customers or result in significant additional costs*; (g) *We have a significant amount of debt and are subject to restrictive debt covenants which could have important consequences related to the success of our business*; (h) *Our products and services are sold primarily through third party retail distribution partners, and the success of our business will depend in part on maintaining our*

26

*relationships with these partners*; (i) *As an MVNO, we are dependent on Sprint Nextel for our wireless network and any disruptions to such network may adversely affect our business and financial results*; (j) *Payments made to Sprint Nextel pursuant to the PCS services agreement are based on estimates, which may cause our reported quarterly results to be less reflective of our actual performance during a given period*; and (k) *We are dependent on our license agreement with the Virgin Group to use the Virgin Mobile brand.* (Emphasis added.)

45.     The purported "Risk Disclosures" contained in the Registration Statement and Prospectus were *not* designed or intended to alert investors to the true risk of investing in VM USA common stock - - including the risk that the Company's operations were *already* adversely impacted and behind plan, and that defendants *already* knew that the Company could not achieve the growth that they forecast.  In addition, these statements were also materially false and misleading for the reasons stated, herein, in ¶¶ 29, 32 - 39, *supra*.

## MATERIALLY FALSE & MISLEADING
## FORWARD-LOOKING STATEMENTS

46.     As a result of defendants' failure to report the below-plan results for 3Q:07, and their failure to revise guidance for the remainder of 2007, at the time of the October 2007 IPO the statements contained in the Registration Statement that purported to define which statements were "forward looking" were also false and materially misleading.  The statements identified as forward looking again portrayed the adverse conditions that were *already* impacting the Company, and that were already known by defendants at the end of 3Q:07, as mere contingencies or possibilities.  As evidence of the foregoing, the Registration Statement also stated, in part, the following:

### SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

*This prospectus contains certain forward-looking statements and information relating to us that are based on the beliefs of our management as well as assumptions made by, and information currently available to, us.* These statements

27

include, but are not limited to, statements about our strategies, plans, objectives, expectations, intentions, expenditures, and assumptions and other statements contained in this prospectus that are not historical facts. When used in this document, words such as "anticipate," "believe," "estimate," "expect," "intend," "plan" and "project" and similar expressions, as they relate to us are intended to identify forward-looking statements. *__These statements reflect our current views with respect to future events__*, are not guarantees of future performance and involve risks and uncertainties that are difficult to predict. Further, certain forward-looking statements are based upon assumptions as to future events that *__may not__* prove to be accurate.

Many factors *__could__* cause our actual results, performance or achievements to be materially different from any future results, performance or achievements that *may* be expressed or implied by such forward-looking statements. These factors include, among other things:

* changes to our business resulting from increased competition;

* our ability to develop, introduce and market innovative products, services and applications;

* our customer turnover rate, or "churn";

* bulk handset purchase and trading schemes;

* changes in general economic, business, political and regulatory conditions;

* availability and cost of the nationwide Sprint PCS network and Sprint Nextel's costs associated with operating the network;

* potential liability resulting from pending or future litigation, or from changes in the laws, regulations or policies;

* the degree of legal protection afforded to our products;

* changes in interest rates;

* changes in the composition or restructuring of us or our subsidiaries and the successful completion of acquisitions, divestitures and joint venture activities; and

* the various other factors discussed in the "Risk Factors" section of this prospectus.

Many of these factors are macroeconomic in nature and are, therefore, beyond our control. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, our actual results, performance or

achievements may vary materially from those described in this prospectus as anticipated, believed, estimated, expected, intended, planned or projected. We neither intend nor assume any obligation to update these forward-looking statements, which speak only as of their dates.

[Emphasis added.]

47.     The statements in the Registration Statement and Prospectus intended to identify and define which statements were "forward looking" were also false and materially misleading. The statements identified as forward looking again portrayed the adverse conditions that were *already* impacting the Company, and which were known by defendants at the end of 3Q:07, as mere contingencies or possibilities. In addition, these statements were also materially false and misleading for the reasons stated, herein, in ¶¶ 29, 32 - 39, *supra*.

## INTERNAL CONTROLS

48.     As stated herein, *supra*, the October 2007 VM USA IPO required an extremely detailed due diligence investigation as a result of the aforementioned control deficiencies that were detected at the end of 2Q:07. Thus, at the time of the IPO, it was again critical to investors that defendants stated that the control defects detected earlier had been cured, and that the Company had sufficient controls and procedures in place such that VM USA complained with, at least, the minimum standards of good corporate governance required by practice and procedure. As evidence of this, the Registration Statement stated, in part, the following:

> ...*We corrected these errors* through a restatement of our results for the three month period ended March 31, 2007 and an out-of-period net adjustment amounting to $(0.1) million (comprised of the cumulative effect of the prior year errors in the amount of $0.5 million, $(0.3) million and $(0.3) million for the years ended December 31, 2006, 2005 and 2004, respectively) reflected in our financial statements for the six months ended June 30, 2007 included in this prospectus. We have not restated our financial statements for any period ended on or prior to December 31, 2006, as *we do not believe these errors were material to any interim or annual prior periods. The impact of the out-of-period adjustments in 2007 are not material to our financial statements for the three month period ended March 31, 2007, the six month period ended June 30, 2007 and our projected*

29

*financial results for the year ending December 31, 2007*. Additionally, we plan to restate our interim results previously reported for the three months ended March 31, 2007 when we file our quarterly report on Form 10-Q for the period ending March 31, 2008 to reflect those out-of-period charges.

*We are in the process of implementing procedures to remediate the material weaknesses that include an external assessment of our revenue flows and control points*, the implementation of additional monitoring controls in the periodic reconciliations of the affected accounts and corrections to the interfaces responsible for the errors....

[Emphasis added.]

49.    The statements concerning the Company's controls and procedures, as well as the statements concerning the remedial actions taken by defendants to cure the defects that they knew, or recklessly or negligently disregarded at the time of the IPO, were materially false and misleading and omitted to disclose material facts necessary to make defendants' statements true and correct, because VM USA's control deficiencies were much more sever than revealed, and the Company did not maintain the most minimum standards of good corporate governance or controls and procedures, as is required by the SEC and the Company's own internal guidelines and standards of business conduct.    Moreover, at the time of the October 2007 Offering, defendants had *not* conducted an adequate due diligence investigation into VM USA, that would have revealed many of these adverse undisclosed conditions, and that would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF VM USA IS BELATEDLY DISCLOSED

50.    It was only on November 16, 2007, however, that investors learned the truth about VM USA's true financial and operational condition, after defendants revealed that the Company had suffered a widening loss for the third quarter, the period ended September 30, 2007, as a result of

30

unexpectedly high expenses. For 3Q:07, the Company reported a loss of $7.3 million, or ($0.15) per share, compared with a loss of only $5.1 million, or ($0.10) per share, in the same period the prior year. These results also contrasted the $28.9 million in net income and profits of $0.55 per share reported in the first six months of 2007, reported prior to the IPO. At that time, defendants also revealed that fourth-quarter 2007 outlook called for approximately 350,000 to 400,000 net customer additions, an anemic amount analysts described as "weak," and that 4Q:07 guidance was "well below" expectations.

51.    Following the belated disclosure of lower then expected 3Q:07 results and higher then expected expenses, on November 16, 2007, the Company's stock price declined precipitously. That day, shares of VM USA fell almost 30% in intra-day trading - - declining from an opening trading price of $11.09 per share to a trading low of $8.07 per share, before closing the trading day at $9.10. That trading day, VM USA shares also experienced exceptionally heavy trading volume with over 6.512 million shares traded - - more than five times recent average daily trading volume.

52.    As investors realized, after the publication of these shocking and belated adverse revelations and admissions, the true but undisclosed negative conditions that existed at the time of the October 2007 IPO, and that continued to adversely impact the Company after that time included, in part, the following:

(a)    At the time of the IPO, the Company had *already* completed its 3Q:07 and knew, or was reckless or negligent in not knowing, that VM USA had reported wider then expected losses, and higher then expected expenses, and that defendants would be forced to lower guidance for 4Q and full year 2007;

(b)    At the time of the IPO, the Company had failed to disclose that expenses were *already* rising above plan and that losses were widening, such that these material omissions rendered

31

the Registration Statement and Prospectus, in light of the statements made by defendants and contained therein, materially false and misleading and in violation of GAAP, SEC reporting rules and the Company's own disclosure policies and procedures;

      (c)    At the time of the IPO, VM USA's control deficiencies were much more severe than revealed and the Company did not maintain minimum standards of good corporate governance or controls and procedures, as is required by the SEC and the Company's own internal guidelines and standards of business conduct; and

      (d)    At the time of the October 2007 Offering, defendants had *not* conducted an adequate due diligence investigation into VM USA, that would have revealed many of the adverse conditions complained of herein, and that would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

## CAUSATION AND ECONOMIC LOSS

53.    In connection with the October 2007 VM USA IPO, defendants signed a materially false and misleading Registration Statement and filed with the SEC and made available to shareholders a materially false and misleading Prospectus. These filings were essential in allowing defendants to complete the Initial Public Offering of 27.5 million VM USA shares and raise over $412.5 million, and to create a public market for trading in Company stock, immediately thereafter.

54.    On November 16, 2007, when defendants' prior misrepresentations and illegal and improper conduct came to be revealed and was apparent to investors, shares of VM USA declined precipitously - - evidence that the prior artificial inflation in the price of Company shares was eradicated. As a result of their purchases of VM USA stock in connection with the IPO, including those who purchase shares traceable to the Offering in the public markets immediately thereafter,

32

plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

55.    By improperly characterizing the Company's financial results and misrepresenting its prospects, the defendants presented a misleading image of VM USA's business and future growth prospects. The IPO Prospectus and Registration Statement emphasized the Company's operating controls and reporting procedures, and at the time of the October 2007 IPO defendants reported results that purported to show the Company's financial condition was improving both sequentially and year over year. These claims caused and maintained the artificial inflation in VM USA's stock at the time of the October 2007 IPO and, thereafter, until the truth about the Company was ultimately revealed to investors.

56.    On November 16, 2007, however, as investors learned the truth about the Company, and learned that the Company had reported a wider then expected loss for 3Q:07, the period ended September 30, 2007 - - *two full weeks prior to the IPO* - - and that growth had slowed such that the Company would be forced to lower guidance for 4Q and full year 2007, shares of the Company declined precipitously. Defendants' belated disclosures had an immediate, adverse impact on the price of VM USA shares.

57.    As a direct result of investors learning the truth about the Company, on November 16, 2007, VM USA's stock price collapsed to just above $8.00 per share, from above $11.00 per share - - a decline of almost 30%, on very heavy trading volume of over 6.51 million shares - - almost five times its average daily trading volume, and almost 25% of all shares issued in the October 2007 IPO. This dramatic share price decline eradicated much of the artificial inflation from VM USA's share price, causing real economic loss to investors who purchased this stock in, or in connection with, the VM USA IPO.

33

58.    The decline in VM USA's stock price following the revelation of defendants' belated

disclosures on November 16, 2007, was a direct result that the nature and extent of defendants'

misrepresentations and omissions contained in the IPO Prospectus became known to investors, and

to the market. The timing and magnitude of VM USA's stock price decline negates any inference

that the losses suffered by plaintiff and the other members of the Class were caused by changed

market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to

defendants' fraudulent conduct. During the same period in which VM USA's share price fell almost

30% as a result of defendants' misrepresentations and omissions being revealed, the Standard &

Poor's 500 securities index was relatively unchanged.

59.    The economic loss, *i.e.* damages suffered by plaintiff and other members of the Class,

was a direct result of defendants' misrepresentations and omissions being revealed to investors, and

the subsequent significant decline in the value of the Company's shares was also the direct result of

defendants' prior misstatements and omissions being revealed, as evidenced by the chart below:



## CLASS ACTION ALLEGATIONS

60.     This is a class action on behalf of all persons who purchased VM USA shares, or

traceable stock, pursuant to the October 2007 Registration Statement and Prospectus (the "Class"),

excluding defendants. Class members are so numerous that joinder of them all is impracticable.

61.     Common questions of law and fact predominate and include whether defendants: (i)

violated the Securities Act; (ii) whether the VM USA IPO Registration Statement and Prospectus

misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

62.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions

would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the

Class. A class action is superior to other available methods for the fair and efficient adjudication of

this controversy.

## CLAIM FOR RELIEF

### For Violations of §11 of the Securities Act Against All Defendants
### and §15 of the Securities Act Against Defendants Sprint and Covina

63.     Plaintiff incorporates each and every allegation above as if stated herein.

64.     The Individual Defendants each signed VM USA's IPO Registration Statement and/or

filed that Prospectus with the SEC and distributed it to investors. The Underwriter Defendants each

permitted their names to be included on the cover of the Prospectus as the Underwriters.

65.     On or about October 11, 2007, the defendants named in this Claim for Relief

completed an IPO of 27.5 million shares of VM USA common stock priced at $15 per share, for total

proceeds of at least $412,500,000.00

66.     Each of the statements alleged herein relating to VM USA's prospects and financial

results made in the October 2007 Prospectus and Registration Statement were materially false or

misleading when issued. The true but concealed facts were that VM USA was not operating

according to plan and that the Company had already recorded disappointing results for 3Q:07, and

defendants knew or recklessly or negligently disregarded that they would also have to lower guidance for 4Q:07 and full year 2007. These adverse conditions had already severely and adversely affected results of the Company prior to the Offering and would continue to hinder the Company in the foreseeable near-term. These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that trends which will have a material effect on a registrant's results be disclosed.

67.     All defendants named in this Claim for Relief, with the exception of VM USA, the issuer (whose liability for the misstatements is absolute), owed to the purchasers of the stock, including plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

68.     The officers and directors of VM USA who were signatories to the Registration Statement and the Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement.  By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, plaintiff and the Class have been damaged.

**69.**     By reason of the conduct herein alleged, each defendant named in this Claim for Relief violated §11 of the Securities Act. Sprint and Corvina by reason of their stock ownership and positions with VM USA, were controlling persons of VM USA and are liable under §15 of the Securities Act.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 21, 2007

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN

By: _____
      JAMES E. CECCHI

**Local Counsel for Plaintiffs
& the Class**

Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street – 12 Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**Attorneys for Plaintiff & the Class**

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify that the matter in controversy is not the subject matter of any other action

pending in any court, or of any pending arbitration or administrative proceeding.

Dated: November 21, 2007

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN

By: _____
JAMES E. CECCHI

**Local Counsel for Plaintiffs
& the Class**

Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street – 12 Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**Attorneys for Plaintiff & the Class**

**EXHIBIT A**

## CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF

__MICHAEL VIGNE___ (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.      Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2.      Plaintiff did not purchase securities of Virgin Mobile USA, Inc. at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period, plaintiff has executed transactions in the securities of Virgin Mobile USA, Inc. as follows. See Attached Schedule.

5.      In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.      Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:    __11-20___, 2007

_____
Plaintiff

Name of plaintiff: MICHAEL Vare

Schedule of plaintiff's Transaction(s) in
Virgin Mobile USA, Inc.

Purchase(s):

| Date | Units | Price |
|------|-------|-------|
| 10/16/07 | 5000 | 15 73 |
| 10/16/07 | 2000 | 15 55 |
| 11/14/07 | 111 | 11 42 |

Sale(s):

| Date | Units | Price |
|------|-------|-------|

"[can] best be pursued if coordinated under the supervision of a single judge." *In re Public Air Travel Tariff Litig.*, 360 F. Supp. 1397, 1399 (J.P.M.L. 1973) (per curiam); *see also In re IDT Corp. Calling Card Terms Litig.*, 278 F. Supp. 2d 1381, 1382 (J.P.M.L. 2003) ("Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary"); *In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*, 424 F. Supp. 504, 506 (J.P.M.L. 1976) (per curiam) (stating that although "voluntary coordination among the parties as a means of avoiding duplicative discovery is commendable, if the actions under consideration are otherwise appropriate for coordinated or consolidated pretrial proceedings, the Panel prefers to place the actions under the control of a single judge in order to ensure that the objectives of Section 1407 are met"). Given the similar factual and legal allegations in these actions, *see* pages 4-6 *supra*, both plaintiffs and defendants will undoubtedly seek largely duplicative discovery. Consolidated and coordinated discovery would avoid such duplication of effort by the parties, reduce litigation costs, and minimize inconvenience to witnesses.

Counsel for plaintiffs also benefit from coordinated pretrial proceedings by combining and streamlining their individual efforts. *See In re Baldwin-United Corp. Litig.*, 581 F. Supp. 739, 741 (J.P.M.L. 1984) (per curiam) (stating that "prudent counsel will combine their forces and apportion the workload in order to streamline the efforts of the parties and witnesses, their counsel and the judiciary, thereby effectuating an overall savings of cost and a minimum of inconvenience to all concerned"); *see also In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*, 424 F. Supp. 424, 507 (J.P.M.L. 1976) (stating that streamlining efforts of the parties and their counsel is "one of the purposes of coordinated or consolidated pretrial proceedings"). This streamlining of efforts further supports consolidation of these actions.

9

C.    *Consolidation Will Avoid The Risk of Conflicting And Duplicative Class Certification Rulings*

Consolidation is appropriate where actions purport to be brought on behalf of similar classes. This Panel has acknowledged that "[i]t is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968). In *In re First Nat'l Bank, Heavener, Okla. Sec. Litig.*, 451 F. Supp. 995, 997 (J.P.M.L. 1978) (per curiam), the Panel held that transfer was "necessary, even though only two actions [were] involved, in order to prevent duplicative pretrial proceedings and eliminate the possibility of inconsistent pretrial rulings." Consistent with these principles, the Panel has repeatedly found that inconsistent pretrial rulings on class certification would be particularly prejudicial to the causes of fairness and efficiency.

In *In re Hotel Tel. Charge Antitrust Litig.*, 374 F. Supp. 1402, 1403 (J.P.M.L. 1974) (per curiam), the Panel transferred a purported class action for consolidated pretrial hearings, holding that the possibility of inconsistent class determinations was a "compelling reason for transfer." *See also In re 7-Eleven Franchise Antitrust Litig.*, 358 F. Supp. 286, 287 (J.P.M.L. 1973) (per curiam) (stating that "the possibility for conflicting class action determinations is an important factor favoring transfer of an action under Section 1407"). The Panel in *In re Res. Exploration, Inc., Sec. Litig.*, 483 F. Supp. 817, 821 (J.P.M.L. 1980) (per curiam), also justified the transfer of several purported class actions based in part on "the fact that most of the actions before us have been brought on behalf of similar or overlapping classes of purchasers . . . ." The Panel further stated that "[i]t is desirable to have a single judge oversee the class action issues in these actions to avoid duplicative efforts and inconsistent rulings in this area." *Id. See also In re Doral Fin. Corp. Sec. Litig.*, 398 F. Supp. 2d 1369, 1370 (J.P.M.L. 2005) (holding that centralization under Section 1407 was necessary, in part, to "prevent

10

inconsistent pretrial rulings (especially with respect to questions of class certification)"); *In re Sierra Wireless Sec. Litig.*, 387 F.Supp. 2d at 1365 (same); *In re Hawaiian Hotel Room Rate Antitrust Litig.*, 438 F. Supp. 935, 936 (J.P.M.L. 1977) (per curiam) ("Section 1407 centralization is especially important to ensure consistent treatment of the class action issues"); *In re Mut. Fund Sales Antitrust Litig.*, 361 F. Supp. 638, 639-40 (J.P.M.L. 1973) (per curiam) ("we have frequently held that the possibility for conflicting class determinations under Rule 23 . . . is an important factor favoring transfer of all actions to a single district"). Consequently, consolidation is appropriate here, where all the actions purport to be brought on behalf of similar classes – namely, purchasers of Virgin Mobile's stock pursuant to its October 2007 IPO. Consolidation will ensure consistency in the adjudication of class issues arising in these actions.[11]

## II.    The Southern District of New York Is The Proper Forum For Coordinated Pretrial Proceedings

In determining the proper forum for consolidated or coordinated pretrial proceedings, the Panel examines, among other factors: the choice of a majority of the litigants, the convenience of the parties and witnesses, the location of the majority of the cases, the connection of the forum to the dispute, and the extent of the proposed transferee court's experience and familiarity with the types of issues presented. *See, e.g., In re Methionine Antitrust Litig.*, 1999 U.S. Dist. LEXIS 19206, at *5-6 (J.P.M.L. Dec. 8, 1999); *In re Library Editions of Children's Books*, 297 F. Supp. 385, 386 (J.P.M.L. 1968); *In re "Factor VIII or IX Concentrate Blood Products" Prods. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993); *In re*

---

[11]    Consolidation will also prevent inconsistent rulings on pretrial motions directed at the merits of plaintiffs' Securities Act claims. *See In re Transocean,* 415 F. Supp. 382, 384 (J.P.M.L. 1976) ("'[T]he likelihood of motions for partial dismissal and summary judgment in all three actions grounded at least in part on [a common issue] makes Section 1407 treatment additionally necessary to prevent conflicting pretrial rulings and conserve judicial effort.").

*Cutter Labs., Inc. "Braunwald-Cutter" Aortic Heart Valve Prods Liab. Litig.*, 465 F. Supp.

1295, 1298 (J.P.M.L. 1979); *In re Wiring Device Antitrust Litig.*, 444 F. Supp. 1348, 1348

(J.P.M.L. 1978); *In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005).

Here, these factors support transfer to the Southern District of New York.

A.    *A Clear Majority of the Litigants Favor the Southern District of New York, Where The Majority Of The Cases Are Pending*

The forum choice of a majority of the litigants is a key factor in determining

competing requests for transfer under 28 U.S.C. § 1407. *See In re Cutter Labs., Inc.*

*"Braunwald-Cutter" Aortic Heart Valve Prods Liab. Litig.*, 465 F. Supp. 1295, 1298 (J.P.M.L.

1979) (transferring actions to forum favored by "a majority of the parties"); *In re Wiring Device*

*Antitrust Litig.*, 444 F. Supp. 1348, 1348 (J.P.M.L. 1978) (transferring actions to forum that is

favored by "all defendants that have taken a position and plaintiffs in a majority of the actions");

*see also In re Doral Fin. Corp. Sec. Litig.*, 398 F. Supp. 2d at 1370 (transferring securities

litigation to Southern District of New York, in part because "most of the responding parties,

including the defendants, a plaintiff and a lead plaintiff movant group, favor this district"). The

choice of the majority is particularly important in cases where "the other convenience factors

seem equally balanced." 17-112 Moore's Fed. Practice – Civil § 112.04[2]. The Panel has also

recognized a preference for a forum in which the majority of related cases are pending. *See In re*

*Methionine Antitrust Litig.*, MDL No. 1311, 1999 U.S. Dist. LEXIS 19206 (J.P.M.L. Dec. 8,

1999) (transferring cases to forum where majority of cases is pending); *See also In re*

*Phonometrics, Inc., Elec. Long Distance Call Cost Computer and Recorder Patent Litig.*, No.

1141, 1997 WL 83673 (J.P.M.L. Feb. 19, 1997) (same).

In this case the majority of cases are pending in the Southern District and an

overwhelming majority of the litigants – all 19 defendants and three of the four plaintiffs – favor

transfer to the Southern District of New York.

B.    *The Southern District of New York is a Convenient Forum for All the Parties and Likely Witnesses*

The Southern District of New York is an easily accessible and convenient forum for all the parties and likely witnesses in these cases. *See In re Library Editions of Children's Books*, 297 F. Supp. 385, 386 (J.P.M.L. 1968) ("Panel must weigh the interests of all the plaintiffs and all the defendants"). First, more defendants have their principal place of business in the Southern District than in any other district.[12] *See In re "Factor VIII or IX Concentrate Blood Products" Prods. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993) (taking into account principle place of business of defendants) ; *In re Alert Income Partners Sec. Litig.*, 788 F. Supp. 1230, 1231 (J.P.M.L. 1992) ("Because several of the [defendant] entities are headquartered in that district, critical parties, witnesses and documents are likely found there."). Second, the Southern District is a convenient forum for the other parties and witnesses who are spread across the United States.[13] New York City is a major transportation hub for the entire United States and

---

[12]    Four corporate defendants have their principal places of business in New York City - Lehman Brothers, Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated and Bear, Stearns & Co., Inc. *See* Lehman Brothers: Who We Are, *available at* http://www.lehman.com/who/history/;   Merrill Lynch: About Us-Global Offices, *available at* http://www.ml.com/index.asp?id=7695_8134_8317 (follow "United States" hyperlink); Bear Stearns: Our Firm, *available at* http://www.bearstearns.com/sitewide/our_firm/index.htm.  In addition, one of the eleven principal offices of Thomas Weisel Partners, LLC is located on Park Avenue (*see* http://www.tweisel.com/AboutUs/TWPOverview/Locations/).

[13]    The other corporate defendants are located in the following states and territories – New Jersey (Virgin Mobile), Florida (Raymond James & Associates, Inc.), California (Thomas Weisel Partners, LLC), Virginia (Sprint Nextel Corp.), and Jersey, Channel Islands (Corvina Holdings Limited).  *See* U.S. Securities and Exchange Commission, Form S-1, Virgin Mobile USA, Inc., filed May 11, 2007, *available at* http://www.sec.gov/Archives/edgar/data/1396546/000119312507097779/ds1.htm; U.S. Securities and Exchange Commission, Form X-17-A-5 FOCUS Report, Raymond James & Associates, Inc., filed Nov. 29, 2006, *available at* http://www.sec.gov/Archives/edgar/data/724743/999999999706049970/9999999997-06-049970-index.htm; U.S. Securities and Exchange Commission, Form X-17-A-5 FOCUS Report, Thomas Weisel Partners, LLC, filed Mar. 1, 2007, *available at* http://www.sec.gov/Archives/edgar/data/1072332/999999999707017600/9999999997-07-017600-index.htm;  U.S. Securities and Exchange Commission, Form 10-Q, Sprint Nextel Corp., filed Nov. 9, 2007, *available at* http://www.sec.gov/Archives/edgar/data/101830/000095013307004520/w41405e10vq.htm;  U.S. Securities and Exchange Commission, Form 4, Corvina Holdings Ltd., filed Oct.

13

is easily accessible for these other parties who will need to travel to the forum for discovery and other pre-trial proceedings. *See In re Rhodia S.A. Sec. Litig.*, 398 F. Supp. 2d 1359, 1360 (J.P.M.L. 2005) (transferring action to Southern District of New York, in part, because "this district, where an action is already pending, provides an accessible, metropolitan location.").[14]

> C.    *The Southern District of New York has a Substantial Connection*
> *to This Dispute*

The New York State Department of Labor has classified the financial services industry as one of state's "cluster industries" where competing, complementary firms and industries are geographically concentrated.[15] Financial services firms in New York City alone employ over 191,000 people.[16] Within that larger classification, the state's securities industry has 6,835 firms that employ over 200,000 employees and generate more than $130 billion in revenue, according to the most recent United States Economic Census.[17] New Jersey, by contrast, has a considerably less developed securities industry. For example, New Jersey has

---

18, 2007, *available at* http://www.sec.gov/Archives/edgar/data/1368861/000118143107062886/xslF345X02/rrd 175088.xml. The location of the nominal plaintiffs (which is currently unknown) is of lesser importance because the lead plaintiff for these cases has yet to be chosen. *See generally* 15 U.S.C. § 78u-4(a)(3) ("Private Securities Litigation–Appointment of Lead Plaintiff").

[14]    New York City has two major airports – John F. Kennedy International Airport (JFK) and LaGuardia Airport (LGA). New York City's Pennsylvania Station is the busiest Amtrak station in the country, serving considerably more Amtrak passengers than any other station in the United States. U.S. Dep't of Transp., Research and Innovative Tech. Admin., Bureau of Transp. Statistics, Top 50 Amtrak Stations by Number of Boardings: Fiscal Year 2004, http://www.bts.gov/publications/transportation_statistics_annual_report/2005/html/appen dix_b/html/table_01_08.html. New York City is also the hub for a number of other major commuter train and bus lines.

[15]    *Industry Clusters: Key to Economic Development*, Emp. N. Y. St. Newsl., July 2007, 1-3, *available at* http://www.labor.state.ny.us/workforceindustrydata/enys_index.shtm.

[16]    New York State Dept. of Labor, Nonfarm Employment by Industry (NAICS) New York State and Metropolitan Areas, Data for New York City, *available at* http://www.labor.state.ny.us/workforceindustrydata/apps.asp?reg=nys&app=emp.

[17]    U.S. Census Bureau, 2002 Economic Census: Finance & Insurance, New York, *available at* http://www.census.gov/econ/census02/data/ny/NY000_52.HTM.

only 2,286 securities firms, which employ 41,234 employees and generate around $13 billion

dollars – approximately 10% of the revenue generated by the New York firms.[18]

        Given the more significant financial services and securities industry presence in

New York, it is likely that more members of the putative class – those institutions and

individuals who purchased shares of Virgin Mobile as part of its IPO – will be located in the

Southern District. *See, e.g., In re Methionine Antitrust Litig.*, 1999 U.S. Dist. LEXIS 19206, at

\*5-6 (J.P.M.L. Dec. 8, 1999) (transferring cases to Northern District of California, because

"California, a state with considerable farming and animal feed operations, has a strong nexus to

the methionine industry.").

    D.    *The Southern District of New York Has The Resources and Judicial Expertise to*
           *Properly Conduct This Litigation*

        The Southern District of New York obviously has the requisite experience and

resources to manage a complex securities docket and would provide an excellent forum for the

Virgin Mobile IPO Litigation. Since 1970, the Southern District of New York has successfully

handled ninety-six MDL actions, including 47 securities class actions.[19] The district also has the

capacity and resources to successfully manage the Virgin Mobile IPO Litigation. It currently has

26 active district judges, 18 senior judges, and 15 magistrate judges, and is therefore more than

capable of handling the caseload likely in the Virgin Mobile IPO Litigation. Based on the cases

per judgeship and the median time from filing to disposition, the Southern District of New

---

[18]    U.S. Census Bureau, 2002 Economic Census: Finance & Insurance, New Jersey, *available at* http://www.census.gov/econ/census02/data/nj/NJ000_52.HTM.

[19]    *See* United States Judicial Panel on Multidistrict Litigation, Multidistrict Litigation Terminated Through September 30, 2007, *available at* http://www.jpml.uscourts.gov/Statistics/Terminated_Dockets_Through_September_2007.pdf.

York's docket is equally capable of handling these cases as the District of New Jersey, the other

potential transferee forum.[20]

The Southern District of New York also has highly experienced and able judges.

See In re Vioxx Prods. Liab. Litig., 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005) (transferring

cases to a judge experienced in complex multidistrict litigation); In re Menthione, 1999 U.S.

Dist. LEXIS at *6 (transferring cases to "a senior judge who is highly experienced in complex

litigation"); 17-112 Moore's Fed. Practice – Civil § 112.04[3] ("[T]he Panel will be likely to

assign the cases to a judge who has already demonstrated an ability to handle such litigation.").

The Honorable Thomas P. Griesa, who has been assigned the two consolidated New York cases,

is an extremely experienced judge who has presided over more than 8,700 cases, including 236

securities law cases, and issued over 960 judicial opinions since 1990.[21]  Judge Griesa also has

experience presiding over numerous complex litigations including securities class actions and

three MDL cases.[22]  See, e.g., Nathan Gordon Trust v. Northgate Exploration, Ltd, et al., 148

F.R.D. 105 (S.D.N.Y. 1993) (granting class certification for claims under §10(b) of 1934 Act);

Victorian Invest. v. Responsive Environments Corp., 56 F.R.D. 543 (S.D.N.Y 1972) (same);

H.W. Urban GmbH v. Rep. of Argentina, No. 02 Civ. 5699 (TPG), 2003 WL 21058254

---

[20]    In 2006, the Southern District of New York had approximately the same number of weighted cases per judge as the District of New Jersey (501 compared to 481) but a slightly faster docket with the median time from filing to trial in the Southern District being 25.7 months versus 33 months in the District of New Jersey.  See Exhib. 7, Reports on the Southern District of New York and the District of New Jersey from the Administrative Office of the U.S. Courts, Federal Court Management Statistics 2006, available at http://www.uscourts.gov/cgi-bin/cmsd2006.pl.

[21]    Although Judge Griesa was appointed to the Federal Bench in 1972, case statistics are only available since 1990.  See Exhib. 8, Litigation History Report for Hon. Thomas Griesa (Westlaw) (Dec. 2007).

[22]    See United States Judicial Panel on Multidistrict Litigation, Multidistrict Litigation Terminated Through September 30, 2007, available at http://www.jpml.uscourts.gov/Statistics/Terminated_Dockets_Through_September_2007.pdf (listing J. Griesa as being assigned MDL Case No. 750 "Transpac SEC" and MDL Case No. 856 "Lou Levy & Sons Fashions, Inc."); see also In re Abercrombie & Fitch Co. Sec. Litig., No. M21-83 (TPG) (S.D.N.Y. Nov. 17, 2003).

(S.D.N.Y. May 12, 2003) (denying class certification in actions brought against Republic of Argentina following its default on bond obligations); *Allan Applestein v. Rep. of Argentina*, No. 02 Civ. 4124 (TPG), 2003 WL 21058248 (S.D.N.Y. May 12, 2003) (same); *H.W. Urban GmbH v. Rep. of Argentina*, No. 02 Civ. 5699 (TPG), 2004 WL 307293 (S.D.N.Y. Feb. 17, 2004) (amending prior order and granting class certification); *In re Reliance Group Holdings, Inc.*, No. 00 Civ. 4653 (TPG), 2003 WL 22741396 (S.D.N.Y. Nov. 19, 2003); *Ramos v. Patrician Equities Corp.*, 765 F.Supp.1196 (S.D.N.Y. 1991).

For example, in 2004 Judge Griesa presided over a case brought by a class of purchasers of stock of a company which owned a 50% interest in a silicone breast implant manufacturer sued under §10(b) of the Securities Exchange Act of 1934, alleging that the company failed to disclose the extent of potential losses it faced in connection with the manufacture and sale of silicone breast implants. *In re Corning, Inc. Sec. Litig.* 349 F.Supp.2d 698 (S.D.N.Y. 2004). Similarly, in *In re Abercrombie & Fitch Co. Sec. Litig.*, Judge Griesa conducted pre-trial proceedings for a number of class actions brought under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, which were transferred to his court under the multi-district procedure and subsequently consolidated. *In re Abercrombie & Fitch Co. Sec. Litig.*, No. M21-83 (TPG) (S.D.N.Y. Nov. 17, 2003) (grant of partial dismissal following filing of amended class action complaint).[23] Accordingly, Judge Griesa has the requisite experience to skillfully and effectively preside over the instant cases.

---

[23] An order approving the settlement of this action was entered on 2/05/07. *See* Exhib. 9, docket sheet for *In re Abercrombie & Fitch Co. Sec. Litig.*, No. M21-83 (TPG), document number 85.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the actions listed in Schedule A be transferred to the Southern District of New York pursuant to 28 U.S.C. § 1407 for consolidated and coordinated pretrial proceedings.

Dated: January 4, 2008

Respectfully submitted,

James Gamble
jgamble@stblaw.com

**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, New York 10017-3954
(212) 455-2700
(212) 455-2502 (fax)
*Counsel for Defendants Virgin Mobile USA,
Daniel H. Schulman, Jonathan Marchbank,
John D. Feehan, Jr., Frances Brandon-
Farrow, Douglas B. Lynn, Mark Poole, Robert
Samuelson, L. Kevin Cox, Thomas O. Ryder,
Kenneth T. Stevens, Sprint Nextel Corp., and
Corvina Holdings, Ltd.*

18

# Exhibit 2

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

RECEIVED
CLERK'S OFFICE

)
)
IN RE: VIRGIN MOBILE IPO LITIGATION  ) MDL DOCKET NO. ____
)
)

2008 JAN -7 P 3: 48

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**MEMORANDUM OF LAW OF THE DEFENDANTS IN SUPPORT OF THEIR
MOTION FOR TRANSFER OF RELATED SECURITIES ACTIONS TO THE
SOUTHERN DISTRICT OF NEW YORK PURSUANT TO 28 U.S.C. 1407 FOR
COORDINATED OR CONSOLIDATED PROCEEDINGS**

Pursuant to Rule 7.2(a) of the Rules of Procedure of the Judicial Panel on

Multidistrict Litigation, defendants Virgin Mobile USA, Inc., Daniel H. Schulman, Jonathan

Marchbank, John D. Feehan, Jr., Frances Brandon-Farrow, Douglas B. Lynn, Mark Poole,

Robert Samuelson, L. Kevin Cox, Thomas O. Ryder, Kenneth T. Stevens, Sprint Nextel Corp.,

Corvina Holdings, Ltd. (the "Moving Defendants"),[1] respectfully submit this memorandum of

law in support of their motion for transfer and consolidation, pursuant to 28 U.S.C. § 1407, of all

related securities actions to the Southern District of New York.[2]  The Moving Defendants submit

that transfer of all related cases to the Southern District of New York is appropriate and will

promote the just, fair and efficient conduct of this litigation, eliminate duplicative discovery,

prevent inconsistent judicial rulings, and conserve both judicial and party resources.

**INTRODUCTION**

To date, four securities class actions have been filed alleging that the Prospectus

and Registration Statement associated with the Virgin Mobile October 2007 IPO contained

materially false and misleading statements in violation of the Securities Act of 1933.  Three of

---

[1]    The Moving Defendants have consulted with counsel for the remaining defendants in
these actions (Lehman Brothers, Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner &
Smith Incorporated, Bear, Stearns & Co., Inc., Raymond James & Associates, Inc. and
Thomas Weisel Partners, LLC) and have been advised that these defendants concur with
this motion.

[2]    *See* Schedule A of Related Actions.

the actions were filed in the Southern District of New York.[3] Two of those cases, Brodsky and

Joseph, have been consolidated pursuant to a stipulation between the parties that was so ordered

by United States District Judge Griesa on December 20, 2007. The parties to the remaining New

York case, 2 West, which was filed on December 28, 2007, have signed a stipulation

consolidating that case which has yet to be entered by the court (together, we refer to the cases as

the "New York Cases"). Under the terms of the consolidation order, a consolidated amended

complaint will be filed after the District Court chooses a lead plaintiff pursuant to the

requirements of the Private Securities Litigation Reform Act ("PSLRA").[4] In addition to the

New York Cases, one case is pending in the District of New Jersey (the "New Jersey Case").[5]

All four of these cases involve the same facts (alleged statements or omissions in

the Virgin Mobile Prospectus and Registration Statement), allege violations of the Securities Act

of 1933, and name the same core defendants (the issuer of the IPO, the issuer's officers and

directors, and the lead underwriters of the IPO).[6] Although the Moving Defendants believe that

these allegations are without merit, if these actions are to proceed, transfer of these actions, and

any subsequently filed actions substantially based on the same operative facts, to one district for

coordinated pretrial proceedings is appropriate to conserve judicial resources, serve the

---

[3]   *See* Exhib. 1, Complaint, *Brodsky v. Virgin Mobile USA, Inc., et al.*, 07-cv-10589 (S.D.N.Y. Nov. 26, 2007) ("Brodsky Compl."); Exhib. 2, Complaint, *Joseph v. Virgin Mobile USA, Inc., et al.*, 07-cv-11060 (S.D.N.Y. Dec. 6, 2007) ("Joseph Compl."); Exhib. 3, Complaint, *2 West, Inc. v. Virgin Mobile USA, Inc., et al.*, 07-cv-11625 (S.D.N.Y. Dec. 28, 2007) ("2 West Compl.").

[4]   A copy of the Order consolidating the Brodsky and Joseph cases is attached as Exhibit 4.

[5]   *See* Exhib. 5, Complaint, *Volpe v. Schulman, et al.*, 07-cv-05619 (D.N.J. Nov. 11, 2007) ("Volpe Compl.")

[6]   Two of the underwriters -- Raymond James & Assoc. Inc. and Thomas Weisel Partners, LLC -- are not named defendants in two of the complaints. *See* Brodsky Compl. at ¶ 10 and 2 West Compl. at ¶ 10.

3

convenience of the parties, prevent inconsistent rulings, and promote the just and efficient conduct of this litigation.

To our knowledge, all of the parties to these actions agree that transfer and coordination of these actions in a single district is appropriate. The sole disagreement centers on the selection of the transferee district. Defendants (along with the plaintiffs in the New York Cases) believe that the Southern District of New York is the correct venue for these actions. First, New York City is the center of the securities industry in the United States, the location of the principal place of business for several of the defendants, and has a substantial connection to this dispute. As such, witnesses (including potential class members who purchased shares of Virgin Mobile as part of its initial offering) are more likely to be located in the Southern District of New York than in any other district. Second, three of the four cases were filed in New York and two have now been consolidated into a single case there (with the third expected to be consolidated shortly), which will promote efficiency for the parties and the court. Third, the overwhelming majority of the parties favor transfer to the Southern District of New York. Finally, the Southern District is well-experienced in handling complex cases and has sufficient resources to efficiently and expeditiously handle these cases.

## FACTUAL BACKGROUND

On October 11, 2007, Virgin Mobile USA, Inc. ("Virgin Mobile") made an Initial Public Offering ("IPO") of approximately 27.5 million shares of common stock at $15 per share. Brodsky Compl. at ¶ 19. Virgin Mobile's stock price declined steadily after the IPO date, from $15 at the offering to $13.10 to $11.26 by the first week of November and down to $10.73 at the close of trading on November 15.[7] After the close of the markets on November 15, 2007, Virgin Mobile issued its third quarter results for 2007 as well as updated guidance for the

7 See Exhibit. 6, Virgin Mobile stock price graph from October 11, 2007 through January 2, 2008.

fourth quarter of 2007. Brodsky Compl. at ¶ 25; Volpe Compl. at ¶ 3. At the close of trading on

November 16, 2007, Virgin Mobile's stock was trading at $9.19 per share.[8] *See* Exhib. 6.

Subsequently, the four putative securities class actions referenced above were filed against

Virgin Mobile, its officers and directors, and the underwriters of the IPO alleging that the

defendants violated the Securities Act of 1933 by distributing a materially false and misleading

Registration Statement and Prospectus in connection with Virgin Mobile's IPO. *See, e.g., id.* at ¶

2.

       The allegations in each of the cases are based on exactly the same core of

operative facts, namely Virgin Mobile's October 2007 IPO, the Registration Statement and

Prospectus issued in connection with the IPO, the decline in Virgin Mobile's stock price after the

IPO, and the announcement of its third quarter 2007 earnings and forecast for the coming fourth

quarter:

- Virgin Mobile's October 2007 IPO. Brodsky Compl. at ¶ 1 ("This is a federal securities class action [related to] the Company's initial public offering on or about October 12, 2007"); Joseph Compl. at ¶ 1 ("This is a federal class action on purchasers of . . . Virgin Mobile's common stock pursuant to or traceable to the Company's Initial Public Offering on or about October 11, 2007"); 2 West Compl. at ¶ 1 ("This is a class action brought by plaintiff on behalf of . . . persons or entities who purchased or acquired the the publicly-traded common stock of Virgin Mobile pursuant or traceable to the Complany's October 11, 2007 initial public offering"); Volpe Compl. at ¶ 1 ("This is a federal securities class action lawsuit brought on behalf of the purchasers of Virgin Mobile . . . common stock pursuant to its October 11, 2007 Initial Public Offering").

- Registration Statement and Prospectus. Brodsky Compl. at ¶ 20 (Virgin Mobile's "Registration Statement and Prospectus contained untrue statements of material fact"); Joseph Compl. at ¶ 57 ("Defendants issued and disseminated . . . material misstatements to the investing public which were contained in the Registration Statement [and Prospectus]"); 2 West Compl. at ¶ 45 ("The Registration Statement/Prospectus contained untrue statements of material facts"); Volpe Compl. at ¶ 66 ("Each of the statements alleged herein relating to [Virgin Mobile's] prospects and financial results made in the October 2007 Prospectus and Registration Statement were materially false or misleading when issued.").

---

[8]    The Volpe complaint incorrectly states the figure at $9.10 per share. *See* Volpe Compl. at ¶ 4.

- Decline in Stock Price since IPO. Brodsky Compl. at ¶ 26 ("At the time of the filing of this complaint, Virgin Mobile stock was trading for approximately $8.44 per share."); Joseph Compl. at ¶ 5 ("The Company's stock continued to decline . . . and closed on November 29, 2007 at $7.25 per share"); 2 West Compl. at ¶ 23 ("On November 16, 2007, shares of the Company's common stock declined approximately 15% to close at $9.19 per share."); Volpe Compl. at ¶ 4 (by November 16, 2007, Virgin Mobile's stock price had dropped and its shares were trading "at $9.10 per share").

- Third Quarter 2007 Announcement. Brodsky Compl. at ¶ 25 ("On November 15, 2007, after the close of the market, Virgin Mobile issued a press release announcing its financial results for the third quarter of 2007"); Joseph Compl. at ¶ 35 ("On November 15, 2007, the Company shocked investors when it issued a press release entitled 'Virgin Mobile USA, Inc. Reports Results for the Third Quarter and First Nine Months of 2007'"); 2 West Compl. at ¶ 20 ("On November 15, 2007 . . . Virgin Mobile announced earnings for the three month period ended September 30, 2007 [and] reported that its third-quarter loss widened to $7.3 million, compared with a loss of $5.1 million in the year-ago quarter."); Volpe Compl. at ¶ 3 (on November 16, 2007, Virgin Mobile reported it had "suffered a widening loss for the third quarter" and that "4Q:07 guidance would be . . . 'well below' expectations.").

Each case also alleges the same basic cause of action – violation of Section 11 of

the Securities Act of 1933 for alleged materially false or misleading statements in the IPO's

Registration Statement and Prospectus:[9]

- Brodsky Compl. at ¶ 1 ("This is a federal securities class action . . . seeking to pursue remedies under the Securities Act of 1933 [concerning] the initial public offering of Virgin Mobile common stock which took place on or about October 12, 2007"), ¶ 20 ("The Registration Statement and Prospectus contained untrue statements of material facts . . . .").

- Joseph Compl. at ¶ 1 ("This is a federal class action on behalf of purchasers of . . . Virgin Mobile's common stock pursuant to or traceable to the Company's Initial Public Offering on or about October 11, 2007"), ¶ 54 ("Defendants knew . . . of the material misstatements and omissions contained in or omitted from the Registration Statement").

- 2 West Comp. at ¶ 38 ("Defendants issued and disseminated . . . material misstatements to the investing public which were contained in the Registration Statement/Prospectus . . . . By reason of the conduct herein alleged, each

---

[9]    The New York Cases also allege violations of Section 12(a)(2) of the Securities Act of 1933. See Brodsky Compl. at ¶ 37; Joseph Compl. at ¶ 8; 2 West Compl. at ¶ 43.

defendant violated and/or controlled a person who violated Section 11 of the Securities Act.")

- Volpe Compl. at ¶ 2 (defendants are "charged with creating or distributing a materially false and misleading Registration Statement and Prospectus in connection with the Company's October 2007 IPO").

Finally, each case names the same core defendants – the issuer of the IPO, the

issuer's officers and/or directors, and the IPO's underwriters:

- <u>Virgin Mobile</u>. Brodsky Compl. at ¶ 7; Joseph Compl. at ¶ 13; 2 West Compl. at ¶ 7; Volpe Compl. at ¶ 1.

- <u>Virgin Mobile's Officers</u>. Brodsky Compl. at ¶ 8; Joseph Compl. at ¶¶ 14-16; 2 West Compl. at ¶¶ 8, 9; Volpe Compl. at ¶ 2.

- <u>Virgin Mobile's Directors</u>. Joseph Compl. at ¶¶ 17-23; Volpe Compl. at ¶ 2.

- <u>The IPO Lead Underwriters</u>. Brodsky Compl. at ¶ 10; Joseph Compl. at ¶ 25; 2 West Compl. at ¶ 10; Volpe Compl. at ¶ 2.

The parties in two of the New York Cases entered into an agreement that (i)

consolidates the actions, (ii) provides that the defendants need not answer the original complaints

as filed, (iii) sets a schedule for the filing of a consolidated complaint (after the court selects an

appropriate lead plaintiff pursuant to the PSLRA) and (iv) sets a schedule for the filing of an

answer or motion to dismiss the consolidated complaint.[10]  On December 20, 2007, the

Honorable Thomas P. Griesa approved this stipulation thereby consolidating these two cases and

approving the briefing schedule for appointment of a lead plaintiff.  The parties to the remaining

New York case, 2 West, which was filed on December 28, 2007, have signed a stipulation

consolidating that case which has yet to be entered by the court.  The parties to the New Jersey

Case have entered into a similar stipulation, which was approved by the Honorable Susan D.

Wigenton on December 17, 2007.  However, the plaintiffs in the New Jersey Case have stated

---

[10]     *See* Exhib. 4, Consolidation Order, at ¶¶ 3, 6, and 7.

that they will not agree to transfer the New Jersey Case to the Southern District of New York to

be consolidated with the New York Cases.

## ARGUMENT

### I.     Consolidation of the Related Actions is Appropriate

The United States Code, 28 U.S.C. § 1407(a), provides in relevant part:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

28 U.S.C. § 1407(a). A straightforward application of the criteria set forth in Section 1407

compels the conclusion that the instant cases should be consolidated for coordinated pretrial

proceedings.

### A.     The Related Actions Involve Common Questions of Fact

The pending actions all address substantially identical questions of fact, which

provides a more than sufficient basis for consolidating or coordinating these actions in a single

forum. See In re UnumProvident Corp. Secs., Derivative & "ERISA" Litig., 280 F. Supp. 2d

1377, 1379 (J.P.M.L. 2003) (consolidating where "all actions [could] be expected to focus on a

significant number of common events, defendants, and/or witnesses" and "the core factual

allegations" were consistent among the actions).

In the present matter, all of the complaints focus on the same alleged misconduct

by defendants, namely, the dissemination of alleged material false and misleading statements

contained in the Virgin Mobile October 2007 IPO Prospectus and Registration Statement. See

pages 4-6, supra. Hence, common questions of fact and law include, inter alia, (a) whether these

statements were false or misrepresented facts about the business, operations and management of

Virgin Mobile; (b) whether there is a causal connection between these allegedly false and

7

misleading statements and the decline in Virgin Mobile's stock price; and (c) to what extent (if any) the members of the putative class sustained damages and the proper measure of such damages. Notably, this Panel routinely consolidates securities actions, such as this one, "that share factual questions arising from alleged misrepresentations or omissions concerning [an issuer's] financial condition." *See, e.g., In re Isolagen, Inc. Sec. Litig.*, 416 F.Supp. 2d 1366, 1367 (J.P.M.L. 2006); *In re Marsh & McLennan Cos. Sec. Litig.*, 429 F.Supp. 2d 1376, 1377 (J.P.M.L. 2006) (ordering consolidation, in part, because actions shared factual questions arising from alleged misrepresentations or omissions concerning the financial condition of issuer); *In re Xybernaut Corp. Sec. Litig.*, 403 F.Supp. 2d 1354, 1355 (J.P.M.L. 2005) (same); *In re Sierra Wireless, Inc.*, 387 F.Supp. 2d 1363, 1364 (J.P.M.L. 2005) (same); *In re AOL Time Warner Secs. Litig.*, 235 F. Supp. 2d 1380, 1381 (J.P.M.L. 2002) (same).

Furthermore, all plaintiffs must adduce evidence of the same legal elements for the common claim of violation of Section 11 of the Securities Act of 1933, and will have to satisfy the class action prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *See In re Grand Theft Auto Video Game Consumer Litig.*, 416 F. Supp. 2d 1350, 1351 (J.P.M.L. 2006) (coordinating and transferring actions where all "arise out of allegations that [certain defendants] engaged in deceptive marketing by failing to disclose . . . hidden sexually explicit content.") These substantially overlapping factual allegations and legal issues are more than sufficient to merit transfer and consolidation or coordination. *See In re Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004) (ruling that "Section 1407 does not require a complete identity or even a majority of common factual issues as a prerequisite to transfer.")

B.    *Consolidation Will Avoid Duplicative Discovery And Provide The Greatest Convenience For The Witnesses And All Parties*

Consolidation also will prevent duplicative discovery and save the parties, witnesses and courts time and effort. As the Panel has recognized, such common discovery

8